UNITED STATES of America, Appellee,

v.

Sheldon Arthur YEFSKY,
Defendant, Appellant.

No. 90–1174.

United States Court of Appeals,
First Circuit.

Heard Dec. 7, 1992.

Decided May 3, 1993.

Theodore L. Craft, Boston, MA, for appellant.

Louis M. Fischer, Atty., Dept. of Justice, Washington, DC, with whom A. John Pappalardo, U.S. Atty., Boston, MA, was on brief, for appellee.

Before TORRUELLA, Circuit Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.

COFFIN, Senior Circuit Judge.

Sheldon Yefsky was convicted by a jury of a dual-object conspiracy, in violation of 18 U.S.C. §§ 371 and 1341, and of four counts of mail fraud, unrelated to the conspiracy, in violation of 18 U.S.C. § 1341. On appeal, Yefsky raises a number of challenges to his conviction. After an exhaustive review of the record, we affirm.

I.

We begin with a brief description of the facts and proceedings.

The Greater Boston Police Council (GBPC) was formed in the early 1960s as a mutual aid society for various metropolitan area law enforcement agencies. The GBPC enabled its members to purchase equipment at reduced prices pursuant to collective purchase agreements. As an unincorporated association, the GBPC relied on one of its members to act as its fiduciary agent.

At all times relevant to this case, the Town of Newton, whose police chief William Quinn served as the chair of the GBPC, fulfilled that role. Quinn, in turn, relied heavily on Timothy Coogan, a civilian employee of the police department, to conduct the daily operations of the GBPC. Coogan became a full-

time employee after graduating from law school and ended his affiliation with Newton in mid–1985, when the offenses underlying this case surfaced.

A primary concern of the GBPC was the inability of the member police departments to communicate with each other by radio. To solve this problem, the GBPC undertook a project to develop an integrated radio system for its members. This system became known as the Boston Area Police Emergency Radio Network (BAPERN).

In 1975, the GBPC hired a Chicago-based firm, Computer and Engineering Services (CES), of which Yefsky is president, to assess the existing radio systems. One year later, CES was awarded a bid contract of $31,000 to design and implement BAPERN. The system used Motorola equipment, which was available at a discount through a GBPC collective purchase contract.

By June 1978, BAPERN was fully operational, connecting 23 cities and towns, and Coogan had became the BAPERN project director and general counsel and administrator for the GBPC. In these capacities, Coogan exercised financial and administrative control of GBPC affairs, including the BAPERN project. He encouraged organizations to join BAPERN and recommended CES to them for engineering and design work. Coogan alone received shipping orders from BAPERN members to the GBPC, prepared GBPC/Newton shipping orders to CES and Motorola, approved invoices from these businesses to the GBPC/Newton for payment, prepared bills from the GBPC/Newton to the BAPERN members, and received the members' payments. Newton officials, including Quinn, merely rubber stamped his work. Coogan was, in many respects, the person most identified with the GBPC.

In 1985, the Internal Revenue Service (IRS) began an investigation of Coogan, which revealed large amounts of income that he had not reported to the IRS. The unreported income stemmed from two sources. First, Coogan had become a paid consultant to International Telecommunications Service, Inc. (ITS), a subsidiary of CES, to perform engineering field work on the BAPERN system. Second, Coogan had overcharged GBPC members for radio equipment and had diverted the overcharge to a secret bank account for his personal use.

In 1989, Coogan, Yefsky, his son Michael Yefsky, the president of ITS, and Samuel Diamond, the financial officer and tax preparer for CES and ITS, were charged with numerous criminal violations stemming from their involvement in the BAPERN project. The indictment charged the existence of two separate schemes to defraud members of the GBPC and charged Coogan alone with tax fraud for concealing his illicit profits from both schemes (Counts 2–4).

The first scheme charged was a conspiracy involving all four defendants (Count 1). The goals of the conspiracy were to pay Coogan kickbacks for sending engineering work to CES and to help him hide that income from the IRS. The kickbacks were the payments ITS made to Coogan, allegedly for his field services. At trial, the government explained that the kickbacks were financed by charging GBPC members for engineering services that were unnecessary or never were performed or by overcharging for work actually done.

The second intrigue implicated Coogan and Yefsky in a mail fraud scheme based on the equipment overcharge and diversion of funds for Coogan's personal use (Counts 5–14). The government consistently has admitted that this was a scheme distinct from the engineering conspiracy. The mailing of ten payments for equipment, maintenance fees, and BAPERN expansion fees by member organizations comprised the individual mail fraud counts.

A tedious and rambling trial stretching 86 days ensued. Over 1000 exhibits were admitted, with more than half subjected to limitations as to the various counts and defendants. The government alone consumed 44 days and 878 exhibits to present its case-in-chief. Yefsky used another 24 days and 376 exhibits to present his defense. The thrust of his defense was that he did not join in either the conspiracy or the equipment scheme but was a pawn of Coogan.

At the trial's conclusion, the jury convicted Coogan of all 14 counts against him. It

convicted Yefsky of the conspiracy count and 4 of the 10 mail fraud counts. It also convicted Michael Yefsky and Diamond of the conspiracy count, the only charge against them.

During the proceedings below, Yefsky made many motions, the decisions of which form the bases of this appeal. These motions include a motion for acquittal based on insufficiency of the evidence; a motion to dismiss the indictment for insufficiency and double jeopardy; a motion for severance; and an omnibus motion for a new trial that reiterated many of these issues as well as errors at trial.

Yefsky, his son, and Diamond appealed their convictions. The government then conceded the insufficiency of the evidence supporting the convictions of Michael Yefsky and Diamond, and the verdicts against them were set aside and dismissed. *United States v. Yefsky,* Memorandum and Order, Nos. 90–1222, –1240 (1st Cir. Jan. 29, 1993). Coogan did not appeal his conviction. Yefsky's appeal remains, and we turn now to the issues he raises.

## II.

Yefsky contends that the district court erred in denying his motion, renewed at close of trial, for acquittal based on insufficiency of evidence. When reviewing a motion for acquittal, we consider the evidence in the light most favorable to the prosecution. *United States v. Torres Lopez,* 851 F.2d 520, 527 (1st Cir.1988). We, therefore, "draw[ ] all legitimate inferences and resolv[e] all credibility determinations in favor of the verdict." *United States v. Angiulo,* 897 F.2d 1169, 1197 (1st Cir.1990).

### A. *The Conspiracy Count*

■ To support a verdict of guilt, the evidence must prove each element of a conspiracy beyond a reasonable doubt. These elements are the existence of a conspiracy, the defendant's knowledge of it, and his voluntary participation in it. *United States v. David,* 940 F.2d 722, 735 (1st Cir.1991). To prove voluntary participation, the government must show that the defendant intended

both to agree with his co-conspirators and to commit the substantive offense. *Id.* Moreover, when the commission of mail fraud is a goal of the conspiracy, the government must show either an intent to use the mails or the reasonable foreseeability of such use. *United States v. Dray,* 901 F.2d 1132, 1137 (1st Cir.1990). We turn now to the facts that the jury reasonably could find in support of the verdict.

■ In 1979, the relationships among the GBPC, Coogan, and Yefsky changed, allowing the conspiracy to germinate. First, Coogan was forced to leave regular employment with the Newton Police Department because he was maintaining a private law practice. He became instead a consultant to the Department and, in 1980, to the GBPC. His duties, however, remained the same: assistant to Quinn (as police chief and GBPC chair), administrator of and general counsel to the GBPC, and project director of BAPERN. In addition, his contracts permitted him to engage in other telecommunications consulting work.

Second, government funding and oversight of the BAPERN project ended. Coogan then prepared an open-ended consulting contract for CES that defined its role during the expansion of BAPERN. The new contract called for CES to provide engineering services as requested by shipping orders issued through Newton on behalf of the GBPC members.

The CES contract did not permit CES to use subcontractors without written consent from Newton. Nonetheless, in December 1979, CES entered a contract with ITS by which ITS would perform field implementation studies and services for various CES projects, including BAPERN, and CES would pay ITS's salaries and overhead expenses.

At some point during this period, Coogan approached Yefsky, proposing to become CES's local "clerk of the works" for the BAPERN project. In December 1979, Coogan entered a contract with ITS to provide field engineering; site, installation and testing supervision; and training for the BAPERN expansion. Unlike Yefsky's other

subcontractors, Coogan was paid a fixed price for each project on which he worked and was not required to submit time sheets to corroborate his fee. Neither Yefsky nor Coogan ever revealed their subcontracting relationship to the GBPC. Coogan, in fact, repeatedly denied to Chief Quinn engaging in any outside telecommunications consulting work.

From 1980 to mid–1985, 25 to 30 organizations joined the BAPERN system. Coogan recommended CES to many of them for engineering work. As a result, CES's income skyrocketed; during this period, the firm received approximately $964,000 for engineering services relating to BAPERN. More than half of the payments were for field work billed by Coogan. Coogan, in turn, received approximately $484,760 from ITS for his services. CES reimbursed ITS for this and other expenses, pursuant to their subcontract.

Many of the payments for engineering were inflated or unnecessary. Yefsky himself testified that he had not performed work for some of the police departments that had paid for engineering services. Some departments also paid more to the GBPC than CES had billed GBPC. Payments routinely were sent to the GBPC by mail.

Coogan did not report his ITS income to the IRS. Nor did ITS file Forms 1099 with the IRS to reflect payments to Coogan. ITS did, however, list the consulting fees as business expenses on its corporate tax returns. CES also listed its payments to ITS as business expenses.[1]

From these facts, the jury reasonably could draw a series of inferences to connect Yefsky to the mail fraud prong of the conspiracy. The jury could find that, once government oversight ended, Coogan and Yef-

sky grasped an opportunity to make money out of the BAPERN project. Thus, it could find that Coogan drafted the open-ended CES contract so that CES could pay him kickbacks to steer work orders to CES. It also could find that CES and Coogan financed the kickbacks by charging inflated fees for engineering work actually performed or completely false fees for work never performed. Accordingly, the jury could find that Yefsky and Coogan agreed to enrich themselves by defrauding the members of BAPERN.

Because we find the evidence sufficient to support Yefsky's conviction of conspiring to commit mail fraud, we uphold his conviction on Count 1 without considering the sufficiency of the evidence supporting the tax fraud object. *See Griffin v. United States,* —— U.S. ——, —— ——, 112 S.Ct. 466, 473–74, 116 L.Ed.2d 371 (1991) (evidence supporting one object of dual-object conspiracy held sufficient to support conspiracy conviction).

### B. *The Mail Fraud Counts*

The indictment charged Yefsky and Coogan with ten counts of mail fraud in connection with the equipment overcharge scheme. Each mailing represented a payment from a BAPERN member that Coogan diverted to his secret bank account. Yefsky was convicted of four of the ten counts.

A conviction for mail fraud[2] requires proof of two elements beyond a reasonable doubt. They are the defendant's participation in a scheme to defraud and the use of the mails, either by or caused by the defendants, in furtherance of the scheme. *United States v. Serrano,* 870 F.2d 1, 6 (1st Cir.1989). The defendant need not instigate the scheme so long as he willfully participates in it, with the knowledge of its fraudu-

---

1. CES and ITS had taken deductions for their payments to Coogan. But they were never indicted for tax fraud in connection with the kickback scheme. Although the two companies were audited by the IRS, they were not required to pay additional taxes for the years in question.

2. The mail fraud statute, 18 U.S.C. § 1341, provides in relevant part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for ob-

taining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting so to do ... takes or receives [from the Postal Service] any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon ... shall be fined not more than $1,000 or imprisoned not more than five years, or both.

lent nature and with the intent to achieve its illicit objectives. *Id.* (citing *United States v. Price,* 623 F.2d 587, 591 (9th Cir.1980)).

■■■ A mailing falls within the scope of the fraud if it is sufficiently connected to the scheme to defraud and reasonably is foreseeable as a result of the participants' actions. *United States v. Pacheco–Ortiz,* 889 F.2d 301, 305 (1st Cir.1989); *United States v. Silvano,* 812 F.2d 754, 760 (1st Cir.1987). The mailing of proceeds of a fraudulent scheme is sufficient to uphold a conviction for mail fraud. *Silvano,* 812 F.2d at 760 (citations omitted).

Yefsky challenges the sufficiency of evidence linking him to the scheme to defraud and to the mailings. Because each count of which he was convicted undisputedly represents a mailing of proceeds of the scheme, Yefsky's convictions must be affirmed if the evidence sufficiently supports his participation in the scheme to overbill for equipment. We turn, therefore, to the evidence of Yefsky's participation in the equipment scheme.

In 1982, the GBPC negotiated a new contract with Motorola for the purchase of equipment. Yefsky assisted Coogan in the negotiations, which resulted in deeper discounts for BAPERN members. Coogan then began to bill BAPERN members inflated prices for Motorola equipment. He also provided false price lists, representing them as part of the Motorola contract, to corroborate the prices he charged. A Motorola employee testified at trial that a comparison of Motorola bills with GBPC bills for equipment revealed that Coogan had overcharged BAPERN members by at least $888,000.

Coogan deposited the overcharge into a bank account opened under GBPC's name but without its knowledge or authorization. He was the only person authorized to withdraw funds from this account. By December 1984, over $1.5 million had been deposited into the account. Coogan diverted this money for personal use, such as purchasing certificates of deposit and paying mortgages. The government conceded at oral argument that Yefsky had no knowledge of this account and did not share in the proceeds from the overcharge.

Yefsky, however, was present at meetings when inflated prices were quoted and discussed. He also recommended the kinds of equipment to be purchased to organizations joining BAPERN and included inflated price lists, obtained from Coogan, in feasibility studies he conducted for two organizations.

The facts connecting Yefsky to the equipment scheme are not as numerous as those connecting him to the engineering conspiracy. Nonetheless, the jury could conclude that Yefsky knew that the equipment prices were being inflated because he had helped to negotiate the purchase agreement that established the legitimate prices. It could conclude that Yefsky then joined the equipment scheme by supporting and using Coogan's quotations of inflated prices. It also could conclude that Yefsky entered the scheme to ensure Coogan's ongoing participation in the engineering conspiracy. These inferences and the facts supporting them are sufficient to sustain Yefsky's convictions of mail fraud.

### III.

■■■ Yefsky next challenges the adequacy of the indictment, claiming that the engineering fraud prong of the conspiracy count was defective because it did not specify the false pretenses used.[3] He contends that this defect deprived him of the ability to present a meaningful defense. The district court agreed that the count did not specify the false pretenses alleged but determined that the indictment as a whole sufficiently warned Yefsky of the charges against him. Memorandum and Order, December 20, 1988, at 2. It therefore refused to dismiss the engineering fraud count. We disagree with the dis-

---

3. The original indictment charged the engineering fraud in Count 5 as a conspiracy separate from the tax fraud conspiracy. When the district court ordered that the two be consolidated, the allegations of the engineering fraud were incorporated virtually verbatim into Count 1. Thus, Yefsky's motion to dismiss Count 5 applies on appeal to Count 1 of the superseding indictment. We refer to the original Count 5 as the "engineering conspiracy" or the "engineering fraud" to avoid confusion with the tax fraud prong of the conspiracy now charged.

trict court's decision but find its error harmless.

■■■■ Rule 7(c)(1) of the Federal Rules of Criminal Procedure requires an indictment to provide "a plain, concise and definite written statement of the essential facts constituting the offense charged." The Supreme Court has instructed that an indictment is sufficient if it contains the elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and enables him to enter a plea without fear of double jeopardy. *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974); *accord, United States v. Serino*, 835 F.2d 924, 929 (1st Cir.1987). The indictment may incorporate the words of the statute to set forth the offense, but the statutory language " 'must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged.' " *Hamling*, 418 U.S. at 117–18, 94 S.Ct. at 2907–08 (quoting *United States v. Hess*, 124 U.S. 483, 487, 8 S.Ct. 571, 573–74, 31 L.Ed. 516 (1888)). An indictment for conspiracy, however, need not allege the predicate offense with the same precision as the substantive count. *Wong Tai v. United States*, 273 U.S. 77, 81, 47 S.Ct. 300, 301–02, 71 L.Ed. 545 (1927); *United States v. Fusaro*, 708 F.2d 17, 23 (1st Cir.1983).

■■■■ Focusing on this last principle, the government argues that the indictment passes muster. It urges that the challenged count's imprecision regarding the mail fraud objective is irrelevant. Because the count clearly charged an *agreement* to defraud by use of the mails, the government argues that Yefsky was able to prepare a defense to the conspiracy charge.

We disagree. " 'Where guilt depends so crucially upon such a *specific identification of fact*, our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute.' " *Hamling*, 418 U.S. at 118, 94 S.Ct. at 2908

(quoting *Russell v. United States*, 369 U.S. 749, 764, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1962)) (emphasis in *Hamling*). We think a mail fraud conspiracy depends so crucially on the underlying fraud that the fraud also must be specified in the applicable count.

We reach this conclusion based on the unusual nature of mail fraud. A multi-member mail fraud is itself treated like a conspiracy. *See Serrano*, 870 F.2d at 6 (multi-member fraud requires each member to participate in common scheme with intent to commit fraud); *see generally United States v. Wormick*, 709 F.2d 454, 461 (7th Cir.1983) (applying conspiracy principles to multi-defendant mail fraud indictment). Thus, the engineering conspiracy count essentially charged Yefsky with agreeing to commit another conspiracy.[4] Yefsky could not be expected to defend himself from a charge of conspiring to join a conspiracy to perpetrate a fraud if the indictment did not identify the fraud that was the ultimate underlying offense.

It is undisputed that the engineering conspiracy count did not identify the plan used to defraud the GBPC. The count alleged only that Coogan had used his control over the GBPC to arrange CES's open-ended engineering contract in 1979, that Coogan had signed a contract with ITS to provide field services, that CES received approximately $964,000 under its new contract, and that ITS paid Coogan $484,760. None of these allegations, on their face, describe fraudulent conduct. The count then stated in conclusory language drawn from the mail fraud statute that Coogan had obtained this money from the GBPC members through false pretenses. It did not divulge the factual basis of this accusation. Accordingly, the count did not provide Yefsky with adequate notice of the charge against him. *Cf. United States v. Nance*, 533 F.2d 699, 702 (D.C.Cir.1976) (noting with approval mail fraud count that specifies misrepresentations); *United States v. Curtis*, 506 F.2d 985, 990 (10th Cir.1974) (citations omitted) (dismissing mail fraud indictment that excludes false pretenses).

4. Yefsky, of course, could have been charged with both conspiracy to commit the engineering fraud and with the substantive mail fraud without risking double jeopardy. *See infra* Section VI.

■ The district court, however, upheld the sufficiency of the indictment because it held that "such specification can be inferred from a reading of the entire indictment." Memorandum and Order at 2. The substantive mail fraud counts specified that Coogan and Yefsky had charged inflated rates for equipment. The court reasoned that the similarity of the engineering conspiracy and the substantive equipment scheme enabled Yefsky to determine that the false pretenses used for the conspiracy must have been overcharges for engineering services.

Contrary to the district court's ruling, the deficiency in the count was not curable by reading the indictment as a whole. " 'Each count in an indictment is regarded as if it was a separate indictment.' " *United States v. Winter,* 663 F.2d 1120, 1138 (1st Cir.1981) (quoting *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190–91, 76 L.Ed. 356 (1932)); 1 Charles A. Wright, *Federal Practice and Procedure: Crim.2d* (*Federal Practice and Procedure*) § 123 at 349 (1982). Thus, each count must be sufficient without reference to other counts unless the allegations of those counts expressly are incorporated. *Winter,* 663 F.2d at 1138 (quoting *United States v. Fulcher,* 626 F.2d 985, 988 (D.C.Cir.1980)); 1 *Federal Practice and Procedure* § 123 at 349. The engineering conspiracy count did not incorporate any of the allegations underlying the equipment fraud counts. We therefore review it standing alone, and, as it was written, the engineering conspiracy count was defective.

Indeed, there is no reason for the conspiracy count to refer to the separate equipment fraud counts. Although it makes sense to read a conspiracy indictment as a whole when the substantive offenses also are the objects of the conspiracy, *see, e.g., Fusaro,* 708 F.2d at 23, the substantive mail fraud counts in this case did not flow from the conspiracy count. The substantively charged scheme encompassed overcharges for equipment, not engineering, and, throughout trial, evidence of the two different overcharges was limited to the appropriate counts. We consider it disingenuous of the government to abandon this distinction, which it repeatedly has emphasized, when the blurring of the schemes conveniently serves a specific argument.

■ The finding of error does not, however, conclude our inquiry. We still must determine whether the defect in the indictment prejudiced Yefsky. *Fusaro,* 708 F.2d at 23 (citations omitted). Having reviewed the record and considered the impact of the error on the jury, we conclude " 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the [jurors'] judgment was not substantially swayed by the error.' " *United States v. Burke,* 948 F.2d 23, 27 (1st Cir.1991) (quoting *United States v. Mazza,* 792 F.2d 1210, 1216–17 (1st Cir.1986) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946))).

Although the indictment itself did not warn Yefsky of the nature of the engineering conspiracy, he received ample notice before trial of the facts underlying it. Months before trial, the district court's decision on his motion informed Yefsky that "it would have been necessary for the defendant to charge inflated rates in order to make the alleged kickbacks to defendant Coogan." Memorandum and Order at 2. In addition, documents provided by the government during discovery revealed the overcharges that formed a basis for the engineering conspiracy. Yefsky, moreover, took 24 days to present his defense, which thoroughly explored his involvement in the BAPERN project and laid the blame for the engineering fraud at Coogan's feet. He thus had ample opportunity to rebut the government's charges. The defect, therefore, was harmless.

## IV.

Yefsky also contends that the conspiracy improperly was joined with the substantive offenses and should have been severed. Alternatively, Yefsky argues that, because the joint trial prejudiced him, the district court should have severed the counts and also should have separated his trial from Coogan's. We deal first with the question of joinder and second with the question of severance.

## A. *Joinder*

 Rule 8 of the Federal Rules of Criminal Procedure governs the joinder of offenses. Offenses may be charged jointly if the acts or transactions from which they stem are related. Fed.R.Crim.P. 8(a), (b). Yefsky contends that joinder of the conspiracy, tax fraud, and mail fraud counts was improper because each set of offenses was comprised of a discrete series of acts. The district court determined that despite the distinct nature of the three offenses, the acts underlying them were sufficiently connected for the offenses to be joined. Memorandum and Order at 3–5. Our review of joinder is plenary. *United States v. Natanel,* 938 F.2d 302, 306–07 (1st Cir.1991) (citing *United States v. MacDonald & Watson Waste Oil Co.,* 933 F.2d 35, 59 (1st Cir.1991)).

Yefsky points out the following dissimilarities among the counts. The engineering conspiracy involved one scheme to pay kickbacks to Coogan and to help him evade tax liability; the tax fraud encompassed Coogan alone; and the substantive fraud scheme entailed a distinct plot to inflate equipment prices, which overcharge Coogan alone pocketed. The conspiracy also predated the equipment overcharge scheme by three years. Yefsky argues that the only common thread in these charges is Coogan and that this single strand is too weak to bind the three offenses.

 There can be no doubt that the tax fraud counts properly were joined with either the conspiracy or the mail fraud counts. As the district court noted, it is axiomatic that a defendant can be charged with both the conspiracy and the substantive offenses arising from it. *United States v. Boylan,* 898 F.2d 230, 245 (1st Cir.1990); *United States v. Arruda,* 715 F.2d 671, 678 (1st Cir.1983). In this case, the conspiracy embraced many of the acts that constituted the tax fraud offenses and, therefore, the two properly were joined under Rule 8(b). Similarly, the tax fraud and mail fraud counts could be joined because some of the unreported income was the fruit of the mail fraud

scheme. *See United States v. Treadwell,* 566 F.Supp. 80, 86–87 (D.D.C.1983), *aff'd,* 760 F.2d 327 (D.C.Cir.1985).

 The harder question is whether the conspiracy and the mail fraud counts properly were joined. Although Count 1 accused defendants of conspiring to commit mail fraud, this engineering conspiracy differed from the equipment scheme charged substantively in Counts 5–14. To determine if the two schemes sufficiently were connected to the same series of acts to be joined, we must consider whether there is "substantial identity of facts or participants" underlying the charged offenses. *United States v. Levine,* 546 F.2d 658, 662 (5th Cir.1977). Mere similarity of the acts would not suffice. *Natanel,* 938 F.2d at 307; *King v. United States,* 355 F.2d 700, 703 (1st Cir.1966).

We conclude that the indictment properly consolidated these counts. Both schemes used the same basic mechanism to overcharge for services and equipment. As the district court found, the engineering conspiracy and the equipment fraud shared the same participants and victims and overlapped in time. Both offenses depended on the interrelationships among the GBPC, Coogan, and Yefsky for their operation. A joint trial of the offenses thus avoided problems of inconsistent verdicts and repetition of testimony. *See United States v. Doherty,* 867 F.2d 47, 63 (1st Cir.1989). Accordingly, the acts underlying the offenses were sufficiently related to warrant joinder.

A finding of proper joinder does not, however, end our inquiry. If a defendant is prejudiced from the joinder of counts, severance may be appropriate, pursuant to Fed. R.Crim.P. 14.[5] We, therefore, must consider whether the benefit of joinder outweighed the risk of prejudice to the defendant. *King,* 355 F.2d at 704.

## B. *Severance*

 Yefsky argues that the district court erred in refusing to sever the engineer-

---

5. Rule 14 provides in relevant part:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information

or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

ing conspiracy from the equipment fraud[6] and his trial from Coogan's. The decision to grant severance is committed to the district court's sound discretion. *Zafiro v. United States,* — U.S. —, — – —, 113 S.Ct. 933, 937–38, 122 L.Ed.2d 317 (1993); *Natanel,* 938 F.2d at 308. Severance is appropriate "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro,* — U.S. at —, 113 S.Ct. at 938. Incidental spillover prejudice, which is almost inevitable in a multi-defendant trial, does not suffice. *United States v. Sabatino,* 943 F.2d 94, 97 (1st Cir.1991); *United States v. Martinez,* 922 F.2d 914, 923 (1st Cir.1991). We will not reverse a denial of severance, therefore, unless the defendant makes "'a strong showing of prejudice.'" *United States v. Gray,* 958 F.2d 9, 14 (1st Cir.1992) (quoting *United States v. Font–Ramirez,* 944 F.2d 42, 45 (1st Cir.1991)).

■ We look first at the severance of counts. In his pre-trial motion to sever, Yefsky suggested only that evidence of the amount of money garnered from the equipment fraud would overwhelm the lack of evidence of his participation in the engineering scheme. The district court refused to sever the counts, finding the mere allegation of potential spillover insufficient to warrant severance. Memorandum and Order at 6.

■ We agree with the district court. It was Yefsky's burden to articulate specific ways in which he was prejudiced. *Zafiro,* — U.S. at —, 113 S.Ct. at 938–39. To make the requisite strong showing of prejudice, a defendant must "present enough information ... to satisfy the court that the claim of prejudice is genuine." *United States v. Tracy,* 989 F.2d 1279, 1284 (1st Cir.1993) (quoting *Baker v. United States,* 401 F.2d 958, 977 (D.C.Cir.1968)). Speculative allegations of prejudice fall far short of the prejudice required to prove an abuse of discretion in denying a motion for severance. *United States v. Porter,* 764 F.2d 1, 13 (1st Cir.1985) (citations omitted). Yefsky did not provide the district court with a factual basis to determine if his claim of prejudice was genuine. On this record, the court did not err in denying the motion to sever counts.[7]

■ Yefsky also contends that he was prejudiced by being tried with Coogan. Specifically, Yefsky argues that the weight of the evidence against Coogan, coupled with the lack of specific instructions at the close of trial limiting that evidence to Coogan, prevented him from presenting adequately his defense that he was merely a pawn in Coogan's scheme.

This argument first ignores the fact that Yefsky was charged with Coogan in a conspiracy and in a separate mail fraud scheme. Evidence against Coogan thus was admissible against Yefsky.[8] *Sabatino,* 943 F.2d at 96; *see Wormick,* 709 F.2d at 461 (applying conspiracy doctrines to multi-member mail fraud schemes). A separate trial, therefore, would not have availed Yefsky.

Second, the argument overlooks the fact that mere antagonism of defenses does not require severance. *Zafiro,* — U.S. at —,

---

**6.** We do not address the question of severing Counts 2–4. Because Coogan was the only defendant charged with tax fraud and he has not appealed, these offenses will not be re-tried and cannot affect Yefsky on a remand.

**7.** On appeal, Yefsky suggests for the first time that he was prejudiced by the jury's inability to differentiate between the engineering conspiracy and the equipment scheme. He bases his argument on the fact that the four substantive counts of which he was convicted involved projects for which he personally performed engineering work. Because this argument was not presented to the district court, even though Yefsky raised the issue of severance again in his post-judgment motion for a new trial, we do not consider it on appeal. *Tracy,* 989 F.2d at 1284 n. 2 (citing

*United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.1990)).

**8.** Toward the close of trial, the district court determined that a preponderance of the evidence demonstrated the existence of a conspiracy, each defendant's membership in it at the time that certain declarations were made, and that these declarations were made in furtherance of the conspiracy. It therefore allowed the issue of conspiracy to go to the jury. *See United States v. Petrozziello,* 548 F.2d 20, 23 (1st Cir.1977). The court later charged the jury that it could consider each co-conspirator's acts and statements in determining a defendant's participation in the conspiracy. Yefsky did not challenge this instruction.

113 S.Ct. at 938; *Arruda,* 715 F.2d at 679 (citations omitted). Instead, the tension between defenses must be so great that a jury would have to believe one defendant at the expense of the other. *Arruda,* 715 F.2d at 679. Yefsky has not met this standard. Although Yefsky proclaimed his innocence by blaming Coogan, Coogan merely denied the occurrence of any fraud. Yefsky cannot credibly complain that a jury believing Coogan's defense therefore would find Yefsky guilty.

The district court, in fact, took appropriate steps to minimize any spillover prejudice Yefsky might suffer. It routinely issued instructions limiting the evidence to the appropriate counts and defendants. Juries are presumed to follow such instructions. *Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987). It also instructed the jury to give separate consideration to an individual defendant's guilt on each count. These instructions were sufficient to cure incidental prejudice from evidentiary spillover. *See Zafiro,* —— U.S. at ——, 113 S.Ct. at 939.

Rule 14 leaves the determination of the risk of prejudice and any necessary remedy to the court's discretion. The district court weighed the risk to Yefsky and acted suitably to protect him. Because Yefsky has not shown any manifest prejudice, the district court did not abuse its discretion in denying his motion to sever.

## V.

Yefsky next argues that the district court erred in excluding defense evidence offered at trial and that the errors prevented him from presenting his defense. We review each piece of evidence in turn.

### A. *Maxine Yefsky*

Maxine Yefsky acted as bookkeeper for her husband's and son's firms. She testified that she had no accounting training and had problems filing correct Forms 1099 with the IRS. The district court barred her from testifying about a conversation she had had with Coogan in January 1981 about these forms. Ms. Yefsky would have testified that Coogan had told her not to file the forms for him because his office would. The court excluded Coogan's statement as hearsay.

Yefsky contends that the court erred in excluding Coogan's statement as hearsay. Yefsky urges that the evidence was not hearsay because he sought to introduce it only to demonstrate his wife's reliance on the statement and his own lack of intent to help Coogan evade taxes. *See United States v. Hicks,* 848 F.2d 1, 3 (1st Cir.1988) (evidence not offered for its truth is not hearsay). The government agrees on appeal that the testimony wrongly was excluded.

We must consider, however, whether the error harmed Yefsky. *Lubanski v. Coleco Indus., Inc.,* 929 F.2d 42, 47 (1st Cir.1991). Our inquiry depends on the centrality of the evidence excluded and the prejudicial effect of the exclusion. *Id.* at 46 (citations omitted). Yefsky argues that the error was highly prejudicial because it effectively prevented him from presenting a defense to the tax fraud conspiracy. His defense was that he had no knowledge of and no intent to assist Coogan's wrongdoing but was merely a pawn.

Our review of the record convinces us that the error was harmless. This evidence was relevant only to the tax fraud objective of the conspiracy count. As we have found sufficient evidence of Yefsky's participation in the engineering fraud objective, *see* Section II *supra,* the erroneous exclusion of Ms. Yefsky's testimony did not affect Yefsky's conviction on Count 1.[9]

### B. *Motorola*

Two Motorola employees called by Coogan testified about their involvement with the BAPERN project. Both testified that they had made sales proposals to prospective

---

9. Moreover, on cross-examination, Yefsky testified that his wife had informed him of her conversation with Coogan. He also testified that, in not filing the tax forms, she had relied on Coogan's assurance that he would. His trial counsel used this testimony in closing argument to support Yefsky's defense. Yefsky himself thus cured the error, and he cannot complain now of prejudice.

customers and had had conversations with their supervisors regarding GBPC pricing procedures and policies. One employee also testified that he knew of equipment prices quoted by Coogan. The court prohibited as hearsay testimony about the substance of the witnesses' conversations with their supervisors and their customers, which would have revealed Motorola's awareness of Coogan's pricing practice.

At trial, Yefsky attempted to use this testimony to show that Motorola had offered BAPERN prices to non-GBPC members. On appeal, Yefsky argues instead that the testimony was admissible to demonstrate his lack of knowledge that Coogan was inflating prices. The government again concedes that the disputed testimony would not be hearsay if offered for the purpose Yefsky now advances. But because Yefsky raises this issue for the first time on appeal, we review the exclusion for plain error. *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985). Yefsky can prevail only if the error was so egregious that he suffered a miscarriage of justice. *Id.*

Yefsky does not meet this standard. Although the employees did not testify about the actual price discrepancies, they did state that they did not discuss the discrepancies with the GBPC chairman. Yefsky thus was able to argue that Motorola tolerated the inflated prices. Yefsky also called a third Motorola employee who testified that Yefsky had consulted Motorola before making three price proposals and that those prices matched Motorola's. Yefsky thus could argue that he did not assist Coogan to inflate equipment prices, or at least acted in good faith when he quoted prices, and that Motorola did not inform him of Coogan's overcharging. Under these circumstances, Yefsky had adequate fuel for his defense and did not suffer from the exclusion of the testimony in question.

■ Yefsky also claims that the district court erroneously excluded the depositions of two police chiefs, which also would have shown Motorola's knowledge of Coogan's

pricing practice. Deposition testimony is admissible, however, only when the witness is unavailable. Fed.R.Evid. 804(b)(1). One of the witnesses actually testified at trial for the government and, so, clearly was available. Yefsky has offered no evidence that the other witness was unavailable. No error, therefore, occurred.

### C. *Harvard Radio Tower Project*

■ A Harvard official testified about Harvard's entry to the BAPERN system. Yefsky then tried to elicit evidence of work he subsequently performed on the Harvard radio tower. The district court excluded the evidence as irrelevant. Yefsky argues that the testimony was admissible as evidence of his good faith as a general business practice.

■ A district court enjoys broad discretion regarding the admissibility of evidence on relevancy grounds. *Conway v. Electro Switch Corp.*, 825 F.2d 593, 597 (1st Cir.1987). We will reverse a court's decision only upon a showing of manifest abuse of discretion. *Id.* (citations omitted).

Yefsky does not make such a showing. At trial and on appeal, Yefsky concedes that his work on the Harvard radio tower project was not connected to any GBPC or BAPERN contract. Nor was it temporally related to BAPERN, for the project came two years after he completed work on Harvard's entry to BAPERN. Accordingly, the district court did not abuse its discretion in refusing to admit testimony so tenuously connected to the issues at hand.[10]

### VI.

Finally, we turn briefly to the issues remaining in Yefsky's appeal.

### A. *Double Jeopardy*

■ Yefsky also raises the severance of counts issue as a problem of double jeopardy. He claims that evidence of the engineering conspiracy impermissibly was used to convict him of the equipment mail fraud and there-

---

10. In any event, we note that the court allowed Yefsky ample time to delve into his work on specific BAPERN projects. He thus was able to use BAPERN work to prove his defense of good faith.

fore caused him to be tried twice for the engineering conspiracy. This claim is mistaken. Yefsky properly could be charged with conspiracy to commit mail fraud and with the underlying substantive mail fraud. *Boylan,* 898 F.2d at 245. Such an indictment would not have exposed Yefsky to double jeopardy because the government would have had to prove different facts for each charge. *See Serino,* 835 F.2d at 930. In an indictment for both conspiracy and mail fraud, the first requires proof of an agreement and an intent to involve the mails, and the second requires proof that the mails were used. *Dray,* 901 F.2d at 1137; *United States v. Camiel,* 689 F.2d 31, 36 (3d Cir.1982). The problem Yefsky raises is that the jury may have been unable to compartmentalize the evidence properly. *See* Section IV *supra.*

**B.** *Jury Charge*

■ Yefsky also contends that the district court erred in not charging the jury that specific intent to commit the object offenses was an essential element of the conspiracy. The court instructed the jury that "[w]hat is necessary is that the defendant must have knowingly and willfully participated in some way in the unlawful plan with the intent to further the unlawful purpose of the conspiracy." Tr. Vol. 82 at 20. We review the jury charge as a whole to determine whether this instruction was erroneous. *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973).

Although the insertion of "specific" before "intent" may be preferable, we find the jury charge sufficient. We upheld a similar instruction in *United States v. Porter,* 764 F.2d 1, 16–17 (1st Cir.1985), which stated, "you would have to find that the person knew that a conspiracy existed and voluntarily entered into it with the intent of achieving the illegal object of the agreement". Here, the court defined the terms "knowingly" and "willfully" for the jury before giving the disputed instruction. In particular, it defined "willfully" to mean "voluntarily and purposefully with the specific intent to do something the law forbids." Tr. Vol. 82 at 15. The court thus clearly instructed the jury that it had to find that Yefsky joined the conspiracy with the specific intent to accomplish the unlawful purpose of the conspiracy, namely tax and mail fraud. Because the instruction adequately covered specific intent, Yefsky is not entitled to any relief. *United States v. McGill,* 953 F.2d 10, 12–13 (1st Cir.1992); *United States v. Nivica,* 887 F.2d 1110, 1124 (1st Cir.1989).

*Affirmed.*