# United States Court of Appeals
## For the First Circuit

No. 09-2472

UNITED STATES OF AMERICA,

Appellee,

v.

MICHAEL A. BERK,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Boudin, Stahl and Howard,
Circuit Judges.

Jeanne M. Kempthorne for appellant.
Margaret D. McGaughey, Assistant United States Attorney,
with whom Thomas E. Delahanty II, United States Attorney, was on
brief, for appellee.

July 27, 2011

**HOWARD**, **Circuit Judge**.  In December 2008, a grand jury in the District of Maine charged Michael Berk with two counts of attempting to entice a minor to engage in sexual conduct and one count of possession of child pornography.  Berk pled guilty to the pornography charge, and he was convicted of the two child enticement charges after a bench trial.  He was sentenced to 200 months in prison.  Two claims are pressed on appeal.  First, Berk argues that the indictment was defective because it lacked an element of the crime charged.  Second, he argues that the evidence presented at trial was legally insufficient to convict him.  We affirm.

## I.

The facts, though disturbing, are not greatly disputed.  Regardless, because Berk challenges the sufficiency of the evidence, we recount them in some detail, and in the light most favorable to the verdict.  United States v. Dwinells, 508 F.3d 63, 65 (1st Cir. 2007).

## A.  Ashley Dame

On the morning of August 28, 2008, police in Biddeford, Maine received a complaint from twenty-three year old handyman Ashley Dame, then a father of four living in Biddeford.  Dame recounted the following chain of events.  Earlier that day, he had solicited employment on Craigslist, the internet-based classified advertisement service.  The ad he posted read:

looking for small odd jobs I am a father of 4 currently out of work looking for the following yard maint, drywalling, painting, firewood cutting splitting and stacking or anything else u may have for me willing to barter or accept cash I have referances and reasonable rates or tell me what ya got for me to do and what u are willing to barter for the work to get done plz be in the biddeford saco oob [presumably Old Orchard Beach] area thanks and hope to meet u soon.

Soon after, Dame received an email from the address "mbmathy@yahoo.com" ("mbmathy") inquiring "How old are the kids? Will you rent any of them out?"[1]  Dame replied that his children's young age was why he was looking for work, and that he "didn't put them on here to do it."  A few minutes later, mbmathy wrote, "Yeah, I didn't know how young so I thought I'd ask if you would consider making money that way -- thanks for the response."  This exchange ensued[2]:

> Dame (11:26 AM): what do you mean rent them out?
>
> mbmathy (11:28 AM): Well how old are they? If they're too young to do anything it doesn't matter anyway :)

---

[1]When a listing is posted on Craigslist, an anonymous email address appears with the ad.  Responses are automatically re-directed to an email address specified by the individual posting the ad, who can then choose to break the anonymity by responding. Printouts of the emails discussed herein were entered into evidence at trial.

[2]Given the general informality of the electronic communication at issue, we reproduce verbatim the text of the exchange.

Dame (11:30 AM):  yeah they are too young for that u do mean like work and whatnot right?if u have anything i will do it.

mbmathy (11:31 AM):  it depends -- how old are they? Boys or girls?

Dame (11:32 AM):  have a 12 yr old daughter and my sons are younger[3]

mbmathy (11:40 AM):  OK and you say you don't want her doing anything for cash, only you?

Dame (11:41 AM):  yeah i am looking for what i said odd jobs such as painting yard maint cutting and splitting wood etc maybe other things let me know what u have

mbmathy (11:43 AM):  Paid oral training is what I'm looking for, stuff along those lines. It pays a lot more than regular odd jobs but as you know it isn't for everyone.

Dame (11:43 AM):  what is it that u are talking about?

mbmathy (11:47 AM):  It's worth a lot of money to me to be able to train a girl how to give head, or anything along those lines (I'm flexible and open-minded) as long as it's discreet.  Like I said most people would just turn an opportunity like this away and that is fine, but it's not like I can just go up to people and ask.
So, I totally understand that it's not what you posted for and it probably isn't something you're willing to consider, but if you'd like to talk about it let me know.  As I mentioned it's worth a lot more than yard work.

Dame (11:49 AM):  where are you located?

mbmathy (11:51 AM):  On the ME/NH border.. not too close-by but it's not across the state either.. What do you think?

_____

[3]Dame's daughter was actually eight at the time.

Dame called the police at 11:53 AM. A police dispatcher had Dame forward copies of the email exchange to her, sent an officer to Dame's house and notified a detective. The responding officer, noting the tenor of mbmathy's messages, also contacted the department detective who investigated sex crimes. After taking Dame's statement and getting his agreement to assist, the officer directed Dame to call the dispatcher, who instructed Dame about how to "continue the conversation."

At 12:14 PM, roughly twenty-three minutes after his last email to Dame, mbmathy messaged, "Is that a no?" Now following the direction of police, Dame responded at 12:32 PM: "am thinking about it can you give me a little more info on this?" Mbmathy provided this detail at 12:43 PM: "I'm looking for something that would happen on an ongoing/regular basis, which would put hundreds of dollars in your pocket depending on what you could offer, availability, etc." He also said that he couldn't be more specific about money "without knowing more details about what [Dame] can offer."

The final email was sent at 2:30 PM. The two men -- with Dame being guided by police -- eventually agreed to meet at a Dunkin Donuts near the Portland airport at 5:30 PM. Mbmathy told Dame that he would be driving a white Pontiac. Dame said that he would arrive in a pick-up truck. In fact, the truck was one that was used by the Maine State Police for undercover work. Sergeant

Dale York was assigned to impersonate Dame, wear a recording device and drive the truck to meet mbmathy.  Other officers maintained visual surveillance and monitored the recording device.

Shortly after York arrived at the meeting place, a black Volkswagen arrived in the parking lot.  Although York was expecting a white Pontiac, he became suspicious when the driver -- later determined to be Berk -- walked by York's truck several times.  Finally, the man approached the truck and asked York if he was waiting for a white Pontiac.[4]  After an exchange of first-name introductions, Berk, satisfied that he was meeting with Dame, cut to the chase.  He expressed his interest in having oral sex with the 12-year old daughter, assured York that he would not hurt the girl, and said that he would cover any travel expenses.  When York pressed Berk for a price, Berk offered $100 per night for oral sex up to $300 per week and added "if there's any more that can happen then it will be more."  Berk also asked how York thought his "daughter" "is going to react to this" and whether York was "going to help this out."

They agreed that future contact would be by email; York said that it would take about a week "to lay the ground work." Berk agreed with York that it was a strange position for the latter to be in, but pointed out that "this is not something that I could go up and just talk to someone about."  York said that he would

_____

[4]A transcript of the Berk-York meeting, taken from the hidden recorder, was entered into evidence.

"see what she thinks.  You know, if she agrees to it, if you want me to email you this weekend or if you rather have it later on." Berk concluded by saying, "Just keep in touch.  As far as I'm concerned the sooner the better.  Because, I don't, I don't want this to just go linger out in the middle of nowhere.  I don't want to be paranoid or anything."

Moments later, other officers approached the truck and took Berk into custody.  He was taken to a local police station where he waived his <u>Miranda</u> rights before agreeing to a videotaped interview.  Asked what he thought was the reason for his arrest, Berk responded that it was related to his two "interests":  paying for sex and girls under the age of 18.  He also said that in his communication with Dame, he "saw somebody who needed some money - I said, hey, do you have any females and . . . as a matter of fact he had a certain female I might be interested in -- so I said alright, well, maybe we should talk about it . . . .  He said she was twelve."  A search of Berk's residence yielded child pornography stored on computers and external storage devices.

B.  Dorothy Jensen

Berk's arrest received coverage from local television news outlets.  Among the viewers was Portland resident Dorothy Jensen, who recognized Berk from a photo that he had sent her during a series of communications regarding an "apartment wanted"

ad that she had posted on Craigslist for her and her 12-year old daughter in early August 2008.

In responding to Jensen's ad, Berk not only said that he knew people with available housing, but also that he could "supplement [Jensen's] income in a way that would give [her] more freedom." He eventually asked for a photo of Jensen and her daughter and sent Jensen one of himself. On August 24, Berk and Jensen had a lengthy colloquy over the internet, using instant messaging. Acknowledging Jensen's earlier comment that she was "running out of time," Berk said that he was "talking about something a little more under the table." When asked for further details, Berk said it depended on what Jensen was "open to sexually" and inquired about her age and marital status. He added that he had asked for the pictures to "see what she looks like, does she have a boyfriend or anything like that?"

After Jensen informed Berk that her daughter had recently broken up with her boyfriend, Berk asked whether Jensen would "be interested in renting her out, getting her trained, anything along those lines . . . ." When asked to be more specific about "training," Berk replied that "it depends on her experience/interests and any limits you'd place on her I suppose. Anything in particular you think she needs to learn better?" In response to Jensen's question, "are we talking behavior or sexually," Berk replied "both!"

Berk explained that he was "really expecting to be able to do this more than once, anywhere from a couple of hours to overnight." He said also that what he would want "would depend on what [Jensen] can offer and what makes sense." He told Jensen that she would be able to inform Berk "what is OK or not OK." Berk glossed over the daughter's "inexperience," asking Jensen if she "mind[ed] if she gets some training" and that "the kind of training depends on what you're open to. I want to make sure you get out of this what you need, and that what you give me works for both of us."

Berk then suggested a meeting with Jensen as soon as the next day. Due to other obligations Jensen couldn't provide a specific meeting time, but agreed to communicate with him the next day. Before any meeting occurred, Jensen saw Berk on television after his arrest and contacted the police.

## **II.**

### A. Challenge to the indictment

Berk first argues that the superseding indictment pursuant to which he was tried was defective because it failed to allege an element of the crime charged. The grand jury charged Berk with two counts (one each with respect to Dame and Jensen) of violating 18 U.S.C. § 2422(b), in that he:

> did use a facility of interstate or foreign commerce, namely the Internet, to knowingly persuade, induce, entice and coerce an individual who had not attained the age of 18

years to engage in <u>sexual activity for which a person could be charged with a criminal offense</u>, and did attempt to do so.

(emphasis added). Berk's main argument is that the indictment was defective because the highlighted phrase did not identify a particular underlying criminal offense "for which [Berk] could be charged," and thus the indictment provided him with insufficient notice.[5] We review the legal question presented de novo. <u>United States</u> v. <u>Lopez-Matias</u>, 522 F.3d 150, 153 (1st Cir. 2008). If error is found, we then review for harmlessness. <u>United States</u> v. <u>Lnu, a/k/a Oshunkey</u>, 544 F.3d 361, 369 (1st Cir. 2008) (citing <u>United States</u> v. <u>Mojica-Baez</u>, 229 F.3d 292, 311 (1st Cir. 2000)).

An indictment is legally sufficient if it "'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" <u>United States</u> v. <u>Cianci</u>, 378 F.3d 71, 81 (1st Cir. 2004) (quoting <u>Hamling</u> v. <u>United States</u>, 418 U.S. 87, 117 (1974)). "The indictment . . . must be a plain,

---

[5]We bypass the government's assertion that Berk waived the lack of notice issue by failing to timely raise it. He also argues that the lack of specificity in the charging document subjected him to a substantial risk of being convicted on a basis other than the one on which the grand jury indicted him. Besides being waived for lack of development in the opening brief, <u>see</u> <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990), this claim is also waived because it was not made at all in the district court. <u>See</u> Fed. R. Crim. P. 12(b)(3)(B) and 12(e) (motion alleging indictment defect, other than indictment's failure to invoke court's jurisdiction or to state an offense, is waived if not raised before trial).

concise and definite written statement of the essential facts constituting the offense charged . . . ." Fed. R. Crim. P. 7(c)(1). It "should be specific enough to notify the defendant of the nature of the accusation against him and to apprise the court of the facts alleged." United States v. Brown, 295 F.3d 152, 154 (1st Cir. 2002) (citing Russell v. United States, 369 U.S. 749, 766-68 (1962)). Setting forth the words of the statute itself is "generally sufficient" if "those words set forth all the elements of the offense without any uncertainty or ambiguity." Id. (citing United States v. Serino, 835 F.2d 924, 929 (1st Cir. 1987)).

The indictment in this case, aside from including the dates of the Dame and Jensen communications and noting "the internet" as the "means of . . . commerce" employed, merely tracks the language of the statute. The first time that the government specified a particular "criminal offense for which [Berk] could be charged" was in its trial brief, which it provided to Berk several weeks before trial. In that instance the government identified the crime as gross sexual assault, in violation of Me. Rev. Stat. tit. 17-A, § 253, which prohibits an individual from having sex with a person under the age of fourteen. Later, in its response to Berk's Rule 29 motion for acquittal, the government again specified section 253.[6]

---

[6]The government also notes that Berk was arrested on state charges of criminal solicitation after he was apprehended in the Dunkin Donuts parking lot.

We have never held that identifying a specific criminal offense is a requirement in a section 2422 indictment. Berk relies on Dwinells to support his argument that specificity is required. In that case, however, although we noted the presence of specific Massachusetts laws in the indictment, we did not state that such particularity was actually required. 508 F.3d at 72. We further observed that in light of the charge in the indictment, the district court correctly instructed the jury that the government had to prove a nexus between the enticement and the particular state law. Id. But we have not spoken to the question of whether the government is required to specify in an indictment what law is implicated. Cases from other circuits are of a kind. See, e.g., United States v. Brand, 467 F.3d 179, 182 (2d Cir. 2006) (noting that indictment stated that illegal sexual activity was intended to take place in New York, but not identifying applicable state statute or whether its inclusion was required); United States v. Hicks, 457 F.3d 838, 840 n.2 (8th Cir. 2006) (noting that indictment listed Missouri criminal statutes, but not indicating whether the listing was required); United States v. Bolen, 136 F. App'x 325, 329 (11th Cir. 2005) (finding indictment was sufficient where it specifically alleged child molestation without indicating whether said specification was required); United States v. Meek, 366 F.3d 705, 711, n.5 (9th Cir. 2004) (noting the particular California criminal statute that would have been violated, but not

-12-

indicating whether it was included in indictment or whether it was required to be).

In a similar vein, courts generally -- including us in an unpublished decision -- have not mentioned the particulars of the criminal offense when describing the elements of a section 2422(b) violation. See, e.g., United States v. Gravenhorst, 190 F. App'x 1, 3 (1st Cir. 2006) (noting that conviction requires showing that "defendant attempted to (1) use a facility of interstate commerce (2) to knowingly persuade, induce, entice, or coerce (3) an individual under the age of 18 (4) to engage in illegal sexual activity."); United States v. Cochrane, 534 F.3d 631, 633 (7th Cir. 2008); United States v. Thomas, 410 F.3d 1235, 1245 (10th Cir. 2005); Brand, 467 F.3d at 201-02; Meek, 366 F.3d at 718).

In the end, the question of whether the specifics of the offense that satisfies the fourth element of the federal offense must be included in the indictment is one that we need not answer in this case. Even were we to assume that the indictment itself was inadequate, "we still must determine whether the defect in the indictment prejudiced" Berk. United States v. Yefsky, 994 F.2d 885, 894 (1st Cir. 1993). We conclude that it did not. In Yefsky we found error in an indictment charging a fraud conspiracy because the indictment failed to adequately set forth the false pretenses employed by the defendant to perpetuate the fraud. Id. The error was harmless, however, because the defendant "received ample notice

before trial of the facts underlying [the conspiracy]." Id. In that case the trial court's rulings, discovery and the nature of the trial defense provided the defendant sufficient opportunity to rebut the government's charges against him. Id.; see also Mojica-Baez, 229 F.3d at 311-12 (holding, on plain error review, that defendant was not prejudiced by failure of indictment to charge element of use of semi-automatic assault weapon, where notice was given through other means).

Here, the record reflects a pretrial exchange of discovery that included the electronic correspondence recounted above. Moreover, the government's trial memo, which specified a Maine criminal statute that Berk's actions would have violated, was provided to Berk more than a month prior to trial. Finally, at the time of his arrest Berk thought that he was meeting with the father of a particular 12-year old girl in whom he had expressed interest on the same date that was stated in the indictment, and he acknowledged the basis for his arrest in his statement to police. These circumstances compel a finding of harmless error. Cf. United States v. Murphy, 762 F.2d 1151, 1153-55 (1st Cir. 1985) (reversing conviction for witness tampering where the indictment failed to indicate which, among many possible "official proceedings," the defendants had allegedly interfered in and where the government posited multiple theories at trial, thus hampering the defendants' ability to defend themselves). Even assuming error, we are

-14-

satisfied, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the [fact finder's] judgment was not substantially swayed by the error." Yefsky, 994 F.2d at 894 (citations and internal quotation marks omitted).[7]

B. Sufficiency of the Evidence

Berk also argues that his motion for judgment of acquittal should have been granted because the evidence at trial was insufficient to prove that he attempted to "persuade, induce, entice or coerce a minor," given that the government's proof involved only contact with adults. After reviewing the evidence in the light most favorable to the verdict, Dwinells, 508 F.3d at 72, we conclude that the evidence was sufficient to sustain the conviction.

"Section 2422(b) criminalizes an intentional attempt to achieve a mental state - a minor's assent - regardless of the

_____

[7]Berk asks us to follow United States v. Mannava, in which the Seventh Circuit held that "the elements of the offense under [the state] statute must[] be elements of the federal offense . . . ." 565 F.3d 412, 415 (7th Cir. 2009). In that case, the indictment noted that the charged sexual activity would have violated Indiana law. Id. at 414. A bill of particulars specified two possible statutes. Id. The court held that "it an was error to allow the jury to convict the defendant without a unanimous determination that the defendant had violated one or both of the Indiana statutes . . . ." Id. But see United States v. Hart, 635 F.3d 850, 855-56 (6th Cir. 2011) (rejecting Mannava and holding that "the underlying [state] criminal offenses are not elements of the federal offense"). Mannava is not of much help in the circumstances of this case, because the concern in that case was that a jury might not reach a unanimous verdict. Berk received a bench trial.

-15-

accused's intentions vis-à-vis the actual consummation of sexual activities with the minor." Dwinells, 508 F.3d at 71 (emphasis in original). The crime of "attempt" requires an intention to commit the substantive offense -- here, critically, to "persuade, induce, entice and coerce" -- and a substantial step towards its commission. United States v. Burgos, 254 F.3d 8, 12 (1st Cir. 2001). A "'substantial step' is less than what is necessary to complete the substantive crime, but more than 'mere preparation.'" United States v. Piesak, 521 F.3d 41, 44 (1st Cir. 2008) (quoting United States v. Rodriguez, 215 F.3d 110, 116 (1st Cir. 2000)); see also United States v. Goetzke, 494 F.3d 1231, 1237 (9th Cir. 2007) (observing that a "'substantial step' . . . cross[es] the line between preparation and attempt by unequivocally demonstrating that the crime will take place unless interrupted by independent circumstances" (internal quotation marks omitted)). Finally, a defendant can be convicted even if the relevant communications are with an intermediary. United States v. Lanzon, 639 F.3d 1293, 1299 (11th Cir. 2011); United States v. Douglas, 626 F.3d 161, 165 (2d Cir. 2010), cert. denied, 131 S. Ct. 1024 (2011); United States v. Nestor, 574 F.3d 159, 162 (3d Cir. 2009), cert. denied, 130 S. Ct. 1537 (2010).

Berk argues that the evidence supports no more than a finding that his internet communications with Ashley Dame "never went beyond mere preparation." We disagree. The trial court could

easily have found that the explicit communications with a person whom Berk thought was the father of a 12-year old girl about "renting her out," along with the concomitant request to see what the girl thought of the idea, were part of an attempt to achieve the requisite mental state in the minor. Beyond that, we have little trouble concluding that actually meeting with the girl's father and discussing with him graphic sexual details and prices goes far beyond "mere preparation."[8]

To be sure, the evidence against Berk with respect to the Jensen matter is not as clear-cut. The record reflects, however, that after responding to Dorothy Jensen's classified ad, Berk not only steered the ensuing conversation away from Jensen's search for housing and towards paying for sex with Jensen's daughter, but he also helped to propel the scheme by finding and sending to Jensen leads about homes that he said she could "rent," even though he was not in the real estate business. In addition, Berk exchanged or attempted to exchange photos with Jensen, and he proposed meeting Jensen in order to discuss details of his "plans" to help Jensen earn money for housing. Even though, unlike in the Dame matter, no such meeting ever took place, it was only the fortuity of Jensen

_____

[8]Testifying in his own defense, Berk claimed that he had no interest in actually having sex with the minors, but was instead engaging in a form of "role playing." The district court, as finder of fact, was, of course, free to reject Berk's defense. United States v. Ford, 22 F.3d 374, 383 (1st Cir. 1994) (noting that finder of fact is free to reject a defendant's explanation of events and that "it is not the province of this court to reweigh conflicting testimony or to make credibility determinations.").

seeing Berk's face and modus operandi on television that prevented it.  These actions go beyond mere "talk" or "hot air."  Cf. United States v. Gladish, 536 F.3d 646, 647 (7th Cir. 2008) (overturning conviction after finding that explicit sexual talk alone was not a "substantial step").  Nor, as Berk suggests, is travel to a meeting necessarily an element of an attempt.  See United States v. Bailey, 228 F.3d 637, 639-40 (6th Cir. 2000) (finding sufficient evidence of "substantial step" where defendant did not meet with minors, but proposed doing so in order to have sex with them).

In sum, the indictment was not fatally defective and the evidence was sufficient to support the convictions in both the Jensen and Dame matters.  Berk also interposed a challenge to his sentence that is dependent on invalidating his conviction.  The predicate having failed, we need not address the argument. **Affirmed**.