UNITED STATES of America, Appellee,

v.

Dennis JOSLEYN, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

John W. BILLMYER, Defendant,
Appellant.

Nos. 95–2146, 95–2147.

United States Court of Appeals,
First Circuit.

Heard June 6, 1996.

Decided Oct. 15, 1996.

David W. Long, with whom Joseph E. Zeszotarski, and Poyner & Spruill, LLP,

were on brief, for defendant, appellant Billmyer.

Paul Twomey, Chichester, NH, with whom Twomey & Sisti Law Offices, was on brief, for defendant, appellant Josleyn.

Michael J. Connolly and Donald A. Feith, Assistant United States Attorneys, Concord, NH, with whom Paul M. Gagnon, United States Attorney, was on brief, for appellee.

Before SELYA, CYR and BOUDIN, Circuit Judges.

CYR, Circuit Judge.

A federal jury sitting in New Hampshire returned guilty verdicts against appellants John W. Billmyer and Dennis R. Josleyn for conspiring to defraud their former employer, American Honda Motor Company ("Honda"), by accepting money and other valuable consideration from prospective Honda dealers in exchange for lucrative dealership rights and sundry advantage. *See* 18 U.S.C. §§ 371 (conspiracy) & 1341 (mail fraud) (1994). Verdicts were returned also against Josleyn for racketeering, conspiracy, and mail fraud, *see id.* §§ 1962(c), 371 & 1341, relating, *inter alia,* to kickbacks received in connection with national sales training seminars and dealer advertising programs for Honda dealers. On appeal, Billmyer and Josleyn principally contend that New Hampshire was an improper venue for the franchise conspiracy charge in Count II and that there was insufficient evidence to support the guilty verdicts. We affirm the district court judgments in all respects.

## I

### BACKGROUND [1]

Following the second OPEC oil embargo in 1979, American consumer demand for the energy-efficient automobiles manufactured by Honda skyrocketed, and remained strong

for a decade thereafter. Just as demand in the United States surged, the Japanese government imposed export restraints on its carmakers, and Honda was unable to meet the demand for its automobiles in the United States. These uncommonly favorable market conditions endured throughout much of the 1980s, causing enterprising car dealers in the United States to compete fiercely (and sometimes unfairly) for exclusive Honda franchises in anticipation of the extraordinarily large profit margins available on such popular Honda models as the Civic, Prelude, and Accord.

Appellant John Billmyer joined Honda as a district sales representative in 1970, and rose rapidly through all four management levels in its field sales division.[2] By 1977, Billmyer had been appointed regional sales manager for the eastern United States. By 1980, he held the top field sales position at Honda—national sales manager—and soon moved from its New Jersey office to headquarters in California. When Honda launched a line of luxury automobiles in 1985, Billmyer became national sales manager for the new Acura Division as well. He remained the top Honda field sales manager in the United States until he retired on March 31, 1988.

After Billmyer retired, he was succeeded as national sales manager by S. James Cardiges, his closest associate at Honda. Billmyer had hired Cardiges as the Honda sales manager for the Baltimore/Washington D.C. district in 1977, and rapidly promoted him through the ranks: from zone manager for the mid-Atlantic states in 1979, to zone manager for the west coast (the largest and most prestigious zone) in 1981, to regional sales manager for the western United States in late 1982. While western regional sales manager, Cardiges worked closely with Billmyer. The two often traveled to work together and took business trips within the United States and overseas. Finally, Cardiges succeeded

---

1. We recite the background facts the jury reasonably could have found, viewing the evidence in the light most favorable to the verdicts. *See United States v. Bello–Perez,* 977 F.2d 664, 666 (1st Cir.1992).

2. At Honda, district sales managers in the field maintained day-to-day contact with their dealers

and reported to their respective zone sales managers. Each zone manager was responsible for Honda sales in several states. Zone managers in turn reported to their respective regional sales managers. The two regional managers each supervised Honda sales in the field for roughly one-half the country.

Billmyer as national sales manager in 1988. He resigned in April 1992 by "mutual agreement" with Honda, to forfend termination.

Appellant Dennis R. Josleyn joined Honda in January 1983, and followed a similar path: assistant sales manager for the mid-Atlantic zone in 1985; mid-Atlantic zone manager in March 1987; and zone manager for the west coast, resident in California, in early 1991, a position he held until he resigned from Honda in April 1992.

Throughout appellants' tenure with Honda, corporate policy and procedures for awarding new Honda dealerships were set forth in the "Honda Automobile Dealer Appointment Procedures Manual." The first step was to identify a geographic area ripe for a new dealership—in Honda terminology an "open point"—through reference to marketing and demographic studies, data relating to competition, and an assortment of other information. Next, the district and zone sales managers for the area under consideration were to "prospect" for a qualified dealer to fill the "open point," then compose a slate of three or more suitable candidates. Honda policy directed that sales managers evaluate candidates according to their experience in automobile retailing, available capital, personal reputation, and the quality of their location and facilities, all with the ultimate aim that Honda dealerships be awarded to the best candidates.

*Honda sales managers at each level, see supra note 2, were required to participate in recommending and approving candidates for any "open point."* With the possible exception of Billmyer and Cardiges, in their respective capacities as national sales manager, *no sales manager at any level possessed unilateral authority to award a new dealership.* Furthermore, approval was required from managers representing the parts, service, and market-representation departments as well.

Once selected for an "open point" dealership, with the approval of sales managers at the district, zone, regional, and national levels, a successful candidate received a "Letter of Intent" ("LOI") from Honda via United States mail, authorizing the prospective dealer to open the new, exclusive dealership upon certain conditions, such as constructing a facility within a specified time. Until the franchise itself was issued to the prospective dealer, however, these LOI rights remained the property of Honda. Like its competitors, Honda exacted no fee for its dealership franchises. Nor were Honda personnel allowed to accept money or other consideration of significant value for assistance in obtaining a Honda franchise.

In addition to Honda policy and procedures governing new dealerships, its "conflict of interest" policy prohibited employees from accepting anything of significant value from a Honda dealer and from acquiring or holding any interest in a Honda or Acura dealership. The "conflict of interest" policy was disseminated among all Honda sales managers, who were required to sign disclosure forms indicating ongoing compliance. Sales managers at every level were duty-bound to ensure that their respective subordinates honored the policy prohibiting conflicts of interest, and report all violations to their senior manager or the Human Resources Department.

Notwithstanding these rigorous internal procedures, however, there were numerous violations of the "conflict of interest" policy. From the late 1970s through the early 1990s, sales managers at every level commonly accepted money and valuable gifts, including Rolex watches, furniture, and business suits, from prospective dealers vying for "open points" or from dealers seeking increased Honda automobile allocations. Yet their illicit activities apparently escaped notice by nonparticipating sales managers and dealers for years.

Finally, in 1991 an internal investigation was triggered by an uninvolved district sales representative in Arkansas who provided a Honda executive vice-president with evidence of payoffs involving Cardiges, then the national sales manager, and a zone manager. By early 1992, Honda had begun "cleaning house" and Cardiges had resigned. An extensive federal criminal investigation ensued.

On March 11, 1994, a federal grand jury in New Hampshire returned an indictment against Billmyer, Josleyn, Cardiges and two lower-level Honda sales managers responsi-

ble for the New England region, David L. Pedersen and Damien C. Budnick.[3] Superseding indictments were returned against Billmyer, Josleyn, and Cardiges in October 1994 and January 1995. Ultimately, Budnick, Cardiges, and Pedersen entered into plea agreements and cooperated with the government. Cardiges and Pedersen were key government witnesses at trial.

The second superseding indictment charged Josleyn and Cardiges, in Count I, with a pattern of racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (1994). As Racketeering Act 1, it alleged that Josleyn and Cardiges had persuaded Honda to select a particular outside vendor (from which the defendants had received kickbacks) to conduct sales training seminars for Honda salespeople employed in New Hampshire and elsewhere in the United States. Racketeering Acts 2 through 8 related to regional advertising associations which pooled monies advanced by individual Honda dealers to defray their local Honda advertising costs. Josleyn and Cardiges were charged with causing Honda to match the contributions made by the Honda dealers to these regional advertising associations, on the condition that the advertising associations hire a particular vendor (controlled by Josleyn's brother) to provide the advertising services. After receiving payments from the regional advertising associations, the vendor allegedly made kickbacks to Josleyn and Cardiges. Other Racketeering Acts described in Count I alleged, *inter alia,* that Josleyn and Cardiges received kickbacks for awarding numerous LOIs to various dealership candidates in California, Maryland, New York, and other states.

Count II charged Billmyer, Cardiges, and Josleyn with conspiring to defraud Honda by accepting payments and other valuable con-

sideration from dealers and prospective dealers in exchange for LOIs or other preferred treatment. Count III (conspiracy) and Count IV (mail fraud) charged Josleyn and Cardiges with accepting kickbacks from 1989 through 1992, in relation to the sales training seminars. Overall, Josleyn was charged in all four counts, whereas Billmyer was charged with the Count II "dealer franchise" conspiracy only.

Trial began on February 7, 1995, before Chief Judge Joseph A. DiClerico, Jr.[4] After presenting thirty-five witnesses, including Cardiges and Pedersen and many Honda dealers from around the country, the government rested its case on May 10, 1995. Billmyer opted to present no witnesses, while Josleyn mounted a defense based on the theory that top Japanese executives in Honda had condoned the activities alleged in the indictment. At the close of the evidence, the district court denied appellants' renewed Rule 29 motions for judgments of acquittal. *See* Fed.R.Crim.P. 29(a).

The case went to the jury on May 19. Seven days into the deliberations, guilty verdicts were returned against both Billmyer and Josleyn. After denying their motions for judgments of acquittal, the district court sentenced Billmyer to a five-year prison term and a $125,000 fine; and Josleyn to six and one-half years in prison on Count I and a five-year prison term on each of the three remaining counts, all to be served concurrently.

## II

### DISCUSSION

#### A. *Joinder of Defendants*

As in the district court, Josleyn and Billmyer contend on appeal that their joint indictment and trial violated Fed.R.Crim.P. 8.[5]

---

3. Pedersen had joined Honda in July 1979 as a district sales manager for Maine, New Hampshire, Vermont, and upstate New York. Within a year he was transferred to Minnesota. Around June 1982, he became a district sales manager in northern Ohio; in 1985, a district sales manager in the new Acura Division, responsible for a territory extending from Maine to Minnesota; and, in March 1987, an assistant zone manager, responsible for the area which included New

Hampshire. Budnick, a district sales manager also responsible for New Hampshire, reported directly to Pedersen.

4. Three weeks into the trial, we were called upon to resolve a discovery dispute. *See United States v. Billmyer,* 57 F.3d 31 (1st Cir.1995).

5. Rule 8 provides:

■ The federal courts have long recognized that consolidated trials tend to promote judicial economy, conserve prosecutorial resources, and foster the consistent resolution of factual disputes common to properly joined defendants. *See, e.g., United States v. MacDonald & Watson Waste Oil Co.,* 933 F.2d 35, 60 (1st Cir.1991). In resolving a Rule 8(b) misjoinder claim, the trial court must examine the indictment to determine whether there is a factual basis for joining the defendants. *United States v. Boylan,* 898 F.2d 230, 245 (1st Cir.), *cert. denied,* 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990). While Rule 8 harbors the potential for unfair prejudice in consolidated trials, *see King v. United States,* 355 F.2d 700, 703–04 (1st Cir.1966) (Aldrich, C.J.) (noting risk that jury may infer guilt by association), the rule nonetheless may be generously construed in favor of joinder, given the protective discretion vested in the trial court under Fed. R.Crim.P. 14.

■ The district court apparently concluded that the Count II dealer franchise conspiracy charge against Billmyer and Josleyn warranted their joinder under Rule 8(b). Its conclusion plainly would have been unexceptionable had the indictment contained only Count II, *see United States v. Morrow,* 39 F.3d 1228, 1237–38 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1421, 131 L.Ed.2d 304 (1995), or had the conspiracy alleged in Count II clearly encompassed all substantive offenses alleged in the indictment. *See United States v. Arruda,* 715 F.2d 671, 678 (1st Cir.1983). Otherwise, joinder under Rule 8(b) was problematic unless the criminal acts alleged *in all counts* were part of the *same series* of acts or transactions. *See United States v. Yefsky,* 994 F.2d 885, 895 (1st Cir.1993).

■ A misjoinder of defendants requires a reversal only if the resulting prejudice " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986) (mandating "harmless error" review of Rule 8(b) misjoinder) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). As it would be incumbent upon this court in all events to conduct the "harmless error" analysis mandated in *Lane* were we to conclude that a misjoinder occurred, *see id.,* and since the misjoinder question itself is far from clear, we will assume, without deciding, that the misjoinder occurred as claimed by Billmyer, and proceed directly to the "harmless error" inquiry. *See United States v. Edgar,* 82 F.3d 499, 504 (1st Cir.) (bypassing misjoinder question where any error ultimately would prove harmless), *cert. denied,* —— U.S. ——, 117 S.Ct. 184, 136 L.Ed.2d 123 (1996). We conclude that any misjoinder was harmless.

Not only did the parties marshal their evidentiary presentations to minimize prejudicial spillover, but throughout the trial the district court prudently and carefully cautioned the jury to consider the evidence against each individual defendant. No less importantly, Billmyer's retirement from Honda, prior to the time Josleyn launched the dealer advertising association and sales training schemes, unquestionably facilitated the individualized factfinding focus to which each defendant was entitled from the jury. *Cf. Morrow,* 39 F.3d at 1235–36 (erroneous admission of hearsay under coconspirator exception held to be "harmless" given distinctiveness of two fraudulent schemes). Finally, at the close of all the evidence, the trial judge gave a careful cautionary instruction, once again reminding the jury to consider the evidence against each defendant individu-

(a) **Joinder of Offenses.** Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the *same or similar character* or are based on the *same act or transaction or* on two or more *acts or transactions* connected together or constituting parts of a *common scheme or plan.*

(b) **Joinder of Defendants.** Two or more defendants may be charged in the same indictment or information if they are *alleged* to have *participated* in the *same act* or transaction or in the *same series of acts* or transactions *constituting an offense* or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Fed.R.Crim.P. 8 (emphasis added).

ally. *See Lane*, 474 U.S. at 450, 106 S.Ct. at 732 (limiting instructions mitigate prejudice from misjoinder).

Although these safeguards may not have sufficed in another case, the evidence against both Billmyer and Josleyn can only be described as overwhelming. *See Randazzo*, 80 F.3d at 628. An army of former Honda executives, including Cardiges, Billmyer's protegé and eventual successor, as well as numerous Honda dealers, presented a wealth of telling evidence against appellants. *See Lane*, 474 U.S. at 450, 106 S.Ct. at 732 (noting overwhelming evidence of guilt); *see infra* Section II.B.3. Consequently, we are persuaded that no aspect of the jury's decision was substantially influenced by any misjoinder. *See O'Neal v. McAninch*, —— U.S. ——, ——, 115 S.Ct. 992, 995, 130 L.Ed.2d 947 (1995).

## B. Sufficiency of the Evidence and Venue (Franchise Conspiracy Count )

The jury found that both appellants participated in the dealership franchise conspiracy alleged in Count II.[6] Neither appellant seriously disputes that he conspired with Cardiges. Rather, their principal contention is that there was insufficient evidence to prove, *beyond a reasonable doubt*, that they both participated in the same conspiracy with Pedersen, which, they maintain, was essential to establish both the substantive conspiracy charge in Count II *and* proper venue in New Hampshire. As their contention confuses the standards of proof applicable to these two distinct issues, and the record demonstrates that the government readily met both, appellants' convictions under Count II must be affirmed.

6. Count II alleged that Billmyer, Josleyn, Cardiges, and others known and unknown, conspired to defraud Honda by accepting money and other valuable consideration in exchange for LOI rights and other preferential treatment to various Honda dealers and prospective dealers. Only one overt act in furtherance of the franchise conspiracy alleged in Count II took place in the District of New Hampshire. It alleged that David Pedersen, then an assistant zone sales manager responsible for New Hampshire, had recommended one Thomas Bohlander for an Acura dealership in Nashua, New Hampshire, in return for approximately $18,000 in college tuition payments for Pedersen's son.

### 1. Standard of Proof

The unchallenged instructions apprised the jury that the government was required to prove four elements, beyond a reasonable doubt, in order to prevail on Count II: (i) two or more persons entered into the unlawful agreement charged in the indictment; (ii) the particular defendant, knowing the purpose of the agreement, knowingly and willfully became a member of the conspiracy; (iii) some member of the conspiracy knowingly committed at least one alleged overt act; and (iv) at least one overt act was committed in furtherance of the conspiracy. *See, e.g., United States v. Sawyer*, 85 F.3d 713, 714 (1st Cir.1996) (citing *United States v. Frankhauser*, 80 F.3d 641, 653 (1st Cir.1996)); *United States v. Brandon*, 17 F.3d 409, 428 (1st Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 80, 130 L.Ed.2d 34 (1994). Thus, the jury need only have found beyond a reasonable doubt that each appellant conspired with at least one other person (e.g., Cardiges), and not necessarily with Pedersen as well.

■ Putting aside for the moment the question of guilt, *see infra* Section II.B.3, it is clear that adequate evidence of Pedersen's role in the dealer franchise conspiracy was essential to establish New Hampshire as a proper venue for Count II.[7] Without objection, the district court instructed the jury that the government must establish, by a *preponderance* of the evidence (rather than beyond a reasonable doubt), that Pedersen, Billmyer and Josleyn joined the Count II conspiracy and that Pedersen committed the alleged overt act involving the Acura dealer-

7. Venue rights are guaranteed by the Constitution, *see* U.S. Const. art. III, § 2, cl. 3; *United States v. Georgacarakos*, 988 F.2d 1289, 1293 (1st Cir.1993), and prescribed by the Federal Rules of Criminal Procedure, *see* Fed.R.Crim.P. 18 ("Except as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed."). Venue "concerns only the place where the case may be tried[,]" whereas jurisdiction "has to do with the authority or power of a court to try a case." Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 16.1, at 334 (1984 & Supp.1991) (footnotes omitted).

ship in Nashua, New Hampshire. *See United States v. Cordero,* 668 F.2d 32, 45 n. 18 (1st Cir.1981) (applying preponderance standard, as venue is not an element of conspiracy offense); *supra* note 6. Thus, consistent with the unchallenged jury instructions on conspiracy and venue, as well as applicable law, the government could establish venue in New Hampshire by only a preponderance of the evidence, but it was required to prove each appellant's participation in the conspiracy beyond a reasonable doubt.[8]

**2. *Standard of Review***

██ We will uphold the verdicts under Count II if a rational juror could have found each substantive element of the alleged conspiracy beyond a reasonable doubt, *United States v. DiMarzo,* 80 F.3d 656, 660 (1st Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 259, 136 L.Ed.2d 185 (1996), and proper venue by a preponderance of the evidence, *Cordero,* 668 F.2d at 45 n. 18. All credibility issues are to be resolved, and every reasonable inference drawn, in the light most favorable to the verdict. *DiMarzo,* 80 F.3d at 660; *United States v. Lam Kwong-Wah,* 924 F.2d 298, 301 (D.C.Cir.1991) (venue). A thorough review of the entire record discloses ample evidentiary support for the verdicts against each appellant.

**3. *Guilt***

██ The Count II conspiracy charge required proof that the particular defendant and at least one other person expressly or tacitly agreed to commit a federal offense. *DiMarzo,* 80 F.3d at 660. The government must have shown that the defendant voluntarily participated to promote a criminal objective. *Brandon,* 17 F.3d at 428. When, as in this case, mail fraud is an alleged goal of the conspiracy, the government must prove either the intent to use the mails or that such

use was reasonably foreseeable. *Yefsky,* 994 F.2d at 890; *see also United States v. Dray,* 901 F.2d 1132, 1137 (1st Cir.) (noting that intent element in conspiracy differs from substantive mail fraud), *cert. denied,* 498 U.S. 895, 111 S.Ct. 245, 112 L.Ed.2d 204 (1990). A particular defendant need not have been familiar with all the details of the conspiracy or with the identities of all other conspirators. *United States v. Innamorati,* 996 F.2d 456, 470 (1st Cir.1993), *cert. denied,* 510 U.S. 1120, 114 S.Ct. 1072, 1073, 127 L.Ed.2d 391 (1994); *United States v. Bello–Perez,* 977 F.2d 664, 668 (1st Cir.1992).

A brief overview leaves no reasonable doubt that Billmyer, Cardiges, and other Honda sales executives, respectively, conspired to defraud Honda by accepting valuable consideration for awarding dealership franchises and other preferential treatment to Honda dealers and prospective dealers.

**a. *Billmyer***

██ As early as 1979, while Billmyer was the eastern regional sales manager, Cardiges, as zone manager for the mid-Atlantic states, accepted a $10,000 payment from a Honda dealer in Philadelphia, and split it with Billmyer. In late 1979 or early 1980, Cardiges presented Billmyer with a gold Rolex watch worth as much as $15,000 from a large Honda dealer in the Washington, D.C. area. Beginning with the 1984 holiday season and continuing through 1992, Cardiges received $20,000 to $25,000 each year from John Rosatti, a Honda dealer in New York City. Rosatti told Cardiges that he was paying Billmyer also, because, as Cardiges testified at trial, like other dealers Rosatti wanted "favorable treatment, wanted more automobiles, more franchises, and wanted the ability to have the ear of the people who were in power at Honda."

---

**8.** The following explanation exposes the fallacy in the unitary standard of proof urged by appellants.

 [T]he evidence may well be sufficient to permit reasonable inferences that a given individual was more likely than not a member of the alleged conspiracy and performed a given act in furtherance of the conspiracy within the district of prosecution, thereby satisfying the

venue requirement, even if the jury finds the same evidence not sufficiently persuasive to cause it, for purposes of assessing guilt, to draw those inferences beyond a reasonable doubt.

*United States v. Rosa,* 17 F.3d 1531, 1541 (2d Cir.) (citation omitted), *cert. denied,* —— U.S. ——, 115 S.Ct. 211, 130 L.Ed.2d 140 (1994).

Cardiges and Billmyer both helped a dealer named Rick Hendrick acquire approximately thirty Honda and Acura franchises in various states, including Texas, Georgia, and the Carolinas. In return, Hendrick helped Cardiges buy a California residence from which Cardiges later realized a $250,000 gain. Thereafter, Hendrick defrayed approximately $150,000 in interest payments on a loan Cardiges had obtained to buy a $700,000 home in Laguna Hills, California. During this same 1989–92 time frame, Hendrick intimated to Cardiges that he was involved in financing Billmyer's home in Palm Springs as well. Cardiges also learned from Billmyer that Hendrick had provided Billmyer with a top-of-the-line BMW.

Cardiges described periodic payoffs from one Marty Luftgarten, who owned dealerships in New Jersey, Philadelphia, and southern California. For example, at the grand opening of a Luftgarten dealership during the mid–1980s, Billmyer, Cardiges, and two other Honda sales managers, Bill Kutchera and Jeff Conway, gathered in a conference room where Luftgarten handed each an envelope containing $5,000 in cash. Around the holiday season, another dealer customarily sent Cardiges $5,000 gift certificates from Neiman–Marcus for both Cardiges and Billmyer. *See Boylan*, 898 F.2d at 242 (noting that defendants often cooperated with one another by collecting payments). The record is replete with other evidence of cash payments from dealers and lavish shopping trips to Hong Kong.

### b. *Josleyn*

 Similarly, there was ample evidence to enable a rational jury to find beyond a reasonable doubt that Josleyn conspired with Cardiges and others to defraud Honda in connection with the Honda dealership franchises. In early 1991, while zone manager for the west coast, Josleyn arranged for a "friend" back east, Joe Pope, to pay $150,000 for the "open point" in Elk Grove, California. Josleyn approached Cardiges, national sales manager, and Robert Rivers, regional manager for the western United States, and advised that there would be money in it for all of them if Pope were to receive the Elk Grove dealership. Thereafter, Cardiges, Rivers, and Josleyn, in direct violation of Honda procedure, decided not to prospect for suitable dealership candidates, and awarded the Elk Grove franchise outright to Pope. As promised, Pope issued a $150,000 check payable to Gary & Associates, a company controlled by Josleyn and his brother Gary. Josleyn in turn gave Cardiges and Rivers each $50,000 in cash.

Cardiges testified that Ed Temple, a former Honda zone manager, approached him in the summer of 1991 in behalf of Bob Frink, a dealer interested in the Folsom, California point. Temple had accepted payoffs from dealers while employed by Honda, and after leaving the company in 1989 established a firm—Blakely Consultants—to facilitate payments to Honda executives from dealers seeking new Honda franchises. Simply put, Temple told Cardiges that Frink was willing to pay Cardiges and Josleyn for the Folsom dealership. On August 5, 1991, Cardiges signed the Folsom LOI, and on the same day Frink paid Blakely Consultants $500,000 for services rendered. Three days later, Temple wrote a $166,666 check to Magnum Marketing, a company owned by Josleyn. Cardiges reported $166,666 from Blakely Consultants on his own 1991 income tax return, although Temple had agreed to hold Cardiges' one-third share until Cardiges left Honda.

We need belabor the point no further, as there was ample evidence to enable the jury reasonably to conclude, beyond a reasonable doubt, that Josleyn was a member of the Count II dealership franchise conspiracy. *See Boylan*, 898 F.2d at 242.

### 4. *Venue*

 As a general rule, venue in a conspiracy case depends upon whether an overt act in furtherance of the alleged conspiracy occurred in the trial district. *United States v. Uribe*, 890 F.2d 554, 558 (1st Cir. 1989); *see* 18 U.S.C. § 3237(a) (1994). The defendant need not have been physically present in the trial district during the conspiracy. *United States v. Santiago*, 83 F.3d 20, 24–25 (1st Cir.1996); *see, e.g., Cordero*, 668 F.2d at 43–44 (furthering drug importation conspiracy with phone calls to undercov-

er DEA agent in Puerto Rico); *cf. United States v. Georgacarakos*, 988 F.2d 1289, 1294 (1st Cir.1993) (contrasting venue for "group" and "individual" crimes). The government acknowledges that venue was proper in the District of New Hampshire only if there was enough evidence for a rational jury to find it more likely than not that Pedersen, Josleyn and Billmyer belonged to the Count II conspiracy.

■ Upon joining Honda as a district sales manager in July 1979, *see supra* notes 2 & 3, Pedersen learned that Honda policy prohibited sales executives from awarding LOIs for personal gain and from accepting gifts valued at more than $25 from dealers. In keeping with Honda policy, Pedersen objected in December 1979 when Bill Lia, a dealer in upstate New York, stuffed an envelope containing cash into Pedersen's pocket. Although Pedersen threatened to report the incident, he relented when Lia told him not to worry because Lia had "already handled the zone." Moreover, Pedersen knew at the time that both his immediate supervisor, Northeast Zone Manager Bill Kutchera, and Billmyer, regional manager for the eastern United States, as well as Cardiges, worked at Honda headquarters in New Jersey. In fact, when Pedersen told Kutchera about the cash bribe tendered by Lia, Kutchera advised Pedersen to ask for a gift certificate in place of the cash. Accordingly, Pedersen ultimately accepted a $300 gift certificate from Lia with Kutchera's explicit approval. Around this same time, Kutchera also told Pedersen that during the course of the previous year he had received two Rolex watches, a cruise, furniture, and other gifts, valued at $13,000, from various dealers.

Pedersen testified that he frequently discussed dealer payoffs with Roger Novelly and Larry Finley, his Honda supervisors in Ohio. Novelly, the assistant zone manager, specifically told Pedersen that Billmyer and Cardiges were being "taken care of" by dealers, and Finley, the zone manager, admitted that Tom Bohlander had paid him for the Honda "open point" dealership franchise in West Cleveland.[9] *See, e.g., Boylan*, 898 F.2d at 243 (noting that tacit accord among alleged conspirators is permissibly inferred from evidence that defendants "often spoke to their victims about other victims or other defendants in words which plainly revealed that the crimes were interdependent"). Based on this evidence, and there was more, the jury would have been permitted to draw the reasonable inference that Pedersen and his various supervisors over the years had developed a *shared* understanding of an "unwritten policy" at Honda: dealers had to pay Billmyer and Cardiges, as well as other sales executives in the chain of command, in order to receive a Honda or Acura franchise or other favorable treatment. *Id.*

John Orsini, a Honda and Acura dealer in Connecticut, provided corroborative testimony at trial, characterizing the kickbacks he had made to Billmyer, Pedersen, and Damien Budnick, Pedersen's subordinate, as a "way of doing business" with Honda. At Budnick's suggestion, Orsini met with Billmyer in September 1987 to discuss obtaining another Acura dealership. A few weeks later, Billmyer offered Orsini a franchise in Nanuet, New York, if Orsini created a "no-show" job for Billmyer's friend, Douglas T. Richert, at $1,000 per week. After Orsini accepted the Billmyer proposal, he received the Nanuet LOI.

Around the same time, Orsini discussed with Budnick and Pedersen the possibility that Orsini might obtain a new dealership franchise in Salem, New Hampshire. According to Pedersen, Orsini and other dealers routinely and unilaterally mentioned Billmyer's name in conversation, as a means of "impress[ing]" on Pedersen the dealers' established connections with higher-level Honda sales managers. Orsini told Pedersen that he would be willing to pay for the Salem franchise, but not the $50,000 demanded by Budnick. After agreeing to help secure the Salem dealership for Orsini in February 1988, Pedersen received between $2,000 and $4,000 in cash from Orsini. Thus, given the circumstantial evidence that both Billmyer

---

9. Significantly, Cardiges identified Finley, Novelly, and Kutchera as fellow conspirators. In addition, Pedersen testified that he subsequently received $5,000 from John Rosatti, a New York Honda dealer who admittedly paid both Cardiges and Billmyer. *See supra* Section II.B.3(a).

and Pedersen shared a common goal or plan to defraud Honda by accepting illicit consideration for awarding new dealership franchises, the jury reasonably could infer, by a preponderance of the evidence, that Billmyer and Pedersen defrauded Honda in connection with the Salem, New Hampshire LOI by accepting payoffs from a common source, Orsini. *See, e.g., Brandon,* 17 F.3d at 450 (finding single conspiracy, despite variations in details and tactics, where main objective, structure, intended victim, and modus operandi remained constant); *supra* Section I.

In addition to accepting illicit payments from Lia and Orsini, the record demonstrates, by a preponderance of the evidence, that Pedersen committed an overt act in New Hampshire in furtherance of the Count II conspiracy, by accepting a free Acura Integra from Bohlander's West Cleveland, Ohio, dealership in 1986. After Bohlander and Pedersen became friends, Pedersen agreed to help Bohlander acquire more Acura dealerships in exchange for a silent ownership interest in a Nashua, New Hampshire, dealership. Pedersen recommended Bohlander for the new Nashua franchise, and in due course Bohlander received it. Although Pedersen later declined an ownership interest in the Nashua dealership, he nonetheless let Bohlander pay roughly $18,000 in college tuition fees for Pedersen's son. Thus, the evidence sufficed to demonstrate, by a preponderance, that venue was proper in the District of New Hampshire. *See Uribe,* 890 F.2d at 558.

Finally, there was evidence from which a rational jury reasonably could have inferred, by a preponderance of the evidence, that Bohlander routinely paid Billmyer and Cardiges as well. Pedersen described a card game at Bohlander's Florida condominium in February 1991, during which Bohlander and Lou Tecco, a dealer associated with Marty Luftgarten, talked about paying bribes as a "way of doing business" with Honda, and noted that Billmyer and Cardiges had to be paid in order to get dealerships and other favorable treatment. Along with the evidence that Bohlander had paid Finley for the West Cleveland dealership and that dealers commonly bribed sales executives at each successive level, *see supra* at p. 1192, Pedersen's testimony permitted the jury reasonably to conclude that it was more likely than not that Bohlander had paid Billmyer, the Acura Division head, as well as Pedersen, in return for the Nashua dealership in 1987. Thus, the similarity in the pattern of fraudulent transactions relating to new dealership franchises, the common core of "insider" participants, and the temporal overlap would enable a rational jury reasonably to infer, under the applicable preponderance standard, that Pedersen, Billmyer, Josleyn, and Cardiges agreed, at least tacitly, to defraud Honda by accepting illicit consideration from candidates for new Honda dealership franchises in direct violation of established Honda policy and procedures. *See Morrow,* 39 F.3d at 1233–34; *Bello–Perez,* 977 F.2d at 668 (noting that conspirators need not know all co-conspirators); *see also United States v. Richerson,* 833 F.2d 1147, 1152–54 (5th Cir. 1987).

## C. *Other Claims By Josleyn*

### 1. *Sufficiency of the Evidence (Counts I, III & IV)*

After the government rested its case, Josleyn moved for acquittal under Counts I, III, and IV, claiming that the evidence was insufficient to establish, beyond a reasonable doubt, that the Honda dealers and their dealer advertising associations had been victimized by the alleged mail fraud since the dealers and advertising associations had received the sales training and advertising services for which they paid. This claim fails as well.

In *United States v. Allard,* 926 F.2d 1237 (1st Cir.1991), we explained that it is no "defense that the victim received *something* in exchange even if it was equivalent in value to what the victim was deceived into relinquishing." *Id.* at 1242 (citing *United States v. King,* 860 F.2d 54, 55 (2d Cir.1988), *cert. denied,* 490 U.S. 1065, 109 S.Ct. 2062, 104 L.Ed.2d 628 (1989)). Given that the proper inquiry under *Allard* is whether Josleyn intended to defraud the dealers and advertising associations into parting with their money, there was ample evidence, particularly the testimony of Cardiges, to support the

jury verdicts against Josleyn under Counts I, III, and IV.

### 2. *Jury Instructions on Condonation*

] The district court rejected Josleyn's proposed jury instruction that the government must prove, beyond a reasonable doubt, that Honda had not condoned Josleyn's fraudulent activities. Ordinarily, a defendant is entitled to an instruction on his theory of the case as long as it is legally valid and there is sufficient evidence, viewed in the light most favorable to the defendant, to permit a reasonable juror to credit the defendant's theory. *United States v. Flores,* 968 F.2d 1366, 1368–69 (1st Cir.1992); *United States v. Shenker,* 933 F.2d 61, 65 (1st Cir. 1991). The government does not dispute that the evidence adduced at trial would have permitted the jury to find that native Japanese executives at the highest levels of Honda implicitly condoned the acceptance of bribes and kickbacks. Nevertheless, the trial court need not adopt the precise instructional language proposed by the defendant. *United States v. DeStefano,* 59 F.3d 1, 3 (1st Cir.1995).

 Viewed as a whole, we think the instruction given by the district court fairly summarized Josleyn's defense theory:

> Since the essential element of the crime charged is intent to defraud, it follows that good faith on the part of the defendant is a complete defense to a charge of mail fraud. A defendant, however has no burden to establish a defense of good faith. The burden is on the government to prove fraudulent intent and the consequent lack of good faith beyond a reasonable doubt.
>
> . . . .
>
> It is the defendant Josleyn's theory of the case that American Honda knew of and condoned; that is, gave tacit approval to the activities of its employees alleged in the indictment that were in violation of its policies. American Honda's knowledge or condonation of the commission of an offense does not *by itself* constitute a defense or an excuse. However, *any evidence of American Honda's actions or omissions, or evidence of deficiencies in the manner in which it implemented and enforced its policies and procedures, may be considered by you to the extent that such evidence bears on the issue of whether or not Mr. Josleyn formed the required intent to commit the crimes with which he is charged.* Mr. Josleyn contends that because he believed American Honda knew of and condoned the activities in question, he did not possess the required intent to commit the offenses with which he is charged.
>
> The defendant has no obligation whatsoever to prove to you that his theory is correct, but rather the burden is always on the government to prove all of the material elements of each offense charged beyond a reasonable doubt[,] including the element of intent with respect to each offense[,] as I have already explained to you. (Emphasis added.)

The charge given by the trial judge unmistakably permitted the jury to consider all the condonation evidence in determining whether Josleyn had formed the requisite intent to defraud Honda. No more was required. *See generally New England Enters., Inc. v. United States,* 400 F.2d 58, 71–72 (1st Cir. 1968) (discussing "good faith" defense to mail fraud), *cert. denied,* 393 U.S. 1036, 89 S.Ct. 654, 21 L.Ed.2d 581 (1969). Since Josleyn neither cites authority, nor demonstrates, that any condonation by Honda was relevant to an element of the charged offenses other than intent, *see Yefsky,* 994 F.2d at 890–91 (listing elements of mail fraud conspiracy and substantive mail fraud); *see also Aetna Cas. Sur. Co. v. P & B Autobody,* 43 F.3d 1546, 1558–60 (1st Cir.1994) (RICO), we conclude that the jury instruction given by the district court was adequate. *See DeStefano,* 59 F.3d at 3; *Shenker,* 933 F.2d at 65–66 (rejecting proposed instruction predicated on impermissibly broad defense); *cf. United States v. Wallach,* 935 F.2d 445, 464 (2d Cir.1991) (mail fraud statute protects property interests of shareholders and corporation against officers' schemes).

### 3. *Impeachment of Cardiges*

Josleyn contends that though the prosecutor was responsible for deliberately suborn-

ing false testimony from Cardiges, the district court unduly impeded Josleyn's efforts to impeach Cardiges on cross-examination. These claims are meritless. *See generally United States v. Osorio*, 929 F.2d 753, 759–60 (1st Cir.1991) (approving reasonable restrictions by trial court on repetitive, harassing, unduly prejudicial, irrelevant, or otherwise improper cross-examination); *cf. United States v. Tavares*, 93 F.3d 10, 14–15 (1st Cir.1996) (rejecting baseless perjury allegation).

On cross-examination, defense counsel asked Cardiges to explain two newspaper articles in which his lawyer reportedly stated that the government had evidence that the top Japanese managers at Honda knew about the alleged criminal activities in its sales division. Cardiges testified that he neither authorized the press statements, nor knew their basis. On redirect, the prosecutor elicited testimony that though Cardiges and his attorney had been afforded "open access" to the government's file, Cardiges had seen "no documents that either indicated or show[ed] that the Japanese knew anything about kickbacks or gifts or anything like that." In response, Josleyn's counsel sought to confront Cardiges with several FBI interview reports—obtained from the government's file—which contained statements by Honda employees to the effect that the Japanese knew about the bribes and kickbacks.

The district court permitted defense counsel to use the FBI reports for impeachment purposes, *i.e.*, to show that Cardiges either did not tell the truth, or had not reviewed the *entire* contents of the government file. But the court ruled that the FBI interview reports were inadmissible hearsay if offered for their truth. *See Innamorati*, 996 F.2d at 480–81; Fed.R.Evid. 801(c) (defining hearsay). On appeal, Josleyn argues that the district court impermissibly restricted recross-examination by refusing to allow the jury to consider *all* hearsay statements in the FBI interview reports.

Our review of the trial transcripts satisfies us that the district court accorded Josleyn ample leeway to explore the FBI interview reports in sufficient detail to enable the jury fairly to weigh Cardiges' testimony relating to the government's file. For example, Cardiges admitted on recross that he had never seen the FBI interview reports, and was "quite sure" that he was not able to get through the "thousands and thousands of documents" during the four-hour period he spent reviewing the government file. The district court did sustain several hearsay objections when defense counsel attempted to delve more deeply into the contents of the FBI interview reports. It did so properly, however, since Josleyn proffered no relevant non-hearsay purpose for probing further. *Cf. United States v. Hudson*, 970 F.2d 948, 956–57 (1st Cir.1992) (defense counsel responded to hearsay objection with impeachment proffer). Nor does Josleyn now challenge these hearsay rulings. Accordingly, we find no error. *See* Fed.R.Evid. 103(a)(2).

### 4. *Delayed Disclosure of Condonation Evidence*

Josleyn claims that he was deprived of a meaningful opportunity to cross-examine Cardiges and other prosecution witnesses due to the government's delayed disclosure of certain letters written to the government by Cecil Proulx, a former Honda executive, outlining his efforts in the late 1980s to bring the pervasive bribes and kickbacks to the attention of Honda's top Japanese executives. The government produced some of the Proulx materials before trial, including a summary of his FBI interview, but found and unseasonably produced additional material months later—upon learning that Josleyn intended to call Proulx as a witness—tending to show that Honda's Japanese managers had condoned the illegal activities in its sales division. Josleyn unsuccessfully moved to dismiss the indictment on due process grounds.

Given the specific discovery request for condonation evidence, the government plainly had an obligation to furnish Josleyn with the Proulx materials in a more timely fashion. *See United States v. Sepulveda*, 15 F.3d 1161, 1178 (1st Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994); *see also* Fed.R.Crim.P. 16(a)(1)(C) (discovery relating to documents material to defense); 16(c) (continuing duty

to disclose). Since the government failed seasonably to disclose evidence "material to guilt or punishment," *United States v. Devin,* 918 F.2d 280, 289 (1st Cir.1990) (citing *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963)), which includes both exculpatory and impeachment evidence, we inquire whether as a consequence of the delayed disclosure defense counsel was unable to use the material "effectively in preparing and presenting the defendant's case." *Id.* (quoting *United States v. Ingraldi,* 793 F.2d 408, 411–12 (1st Cir.1986)). Due to its greater familiarity with the dynamics of the case, we will not reverse a district court's ruling on delayed disclosure unless it amounts to a demonstrable abuse of discretion. *Id.* We discern no abuse of discretion.

First, a principal concern in delayed disclosure cases—whether the failure to supply the information in a seasonable fashion caused the defense to change its trial strategy, *see id.* at 290—is not significantly implicated in this case. Josleyn consistently pursued the same defense theory both before and after the Proulx materials were provided, by arguing that the Japanese managers at Honda had condoned the charged conduct. Secondly, even though the Proulx materials unquestionably provided additional support for the condonation "defense," we are not persuaded that the delay in disclosure adversely affected the defense in any important respect. In fact, while Cardiges was on the witness stand, Josleyn's counsel observed that "the government's file is like 100,000 pages or so." *See also infra* note 10. The defense took full advantage of the condonation evidence by using it in its own case, even before the tardily produced Proulx materials were made available, then featured the government's delayed disclosure in its closing argument.[10]

On this record, we think the district court soundly concluded that the Proulx materials added little to the evidence previously produced by the government, and therefore its

late disclosure had not impeded Josleyn's defense to a significant degree. *See United States v. Catano,* 65 F.3d 219, 227 (1st Cir. 1995) (noting cumulativeness of impeachment materials); *Sepulveda,* 15 F.3d at 1179 (holding that failure to produce "incremental information" caused no prejudice). We note as well that Josleyn makes no claim that the prosecutor intentionally delayed disclosure.

Furthermore, and by no means least importantly, the only relief Josleyn requested was the outright dismissal of the indictment. The district court has broad discretion to redress discovery violations in light of their seriousness and any prejudice occasioned the defendant. *Osorio,* 929 F.2d at 762–63; *see also* Fed.R.Crim.P. 16(d)(2) (authorizing district court to "permit the discovery or inspection, grant a continuance, or prohibit the party from introducing the evidence not disclosed, or ... enter such other order as it deems just under the circumstances"). On the other hand, the draconian relief demanded by Josleyn was grossly disproportionate both to the prosecution's nonfeasance and any prejudice to the defense. *See Bello–Perez,* 977 F.2d at 670 (favoring continuance over dismissal); *accord Devin,* 918 F.2d at 290–91. As Josleyn eschewed various alternative remedies more consonant with the government's culpability and any prejudice to the defense, *see, e.g., Osorio,* 929 F.2d at 762–63 (noting, as alternative remedies, recalling witness for additional cross-examination, affording defense greater leeway with witnesses, and instructing jury that government failed to meet discovery obligations), we find no abuse of discretion in refusing to dismiss the indictment.

### 5. *Closing Argument*

Josleyn claims that the lead prosecutor improperly vouched for the credibility of government witnesses, and Cardiges in particular, during rebuttal. Absent contem-

---

10. Defense counsel argued in closing:

 When you ask [a witness] a question, when the question is asked [whether] you've gone through our files and there's nothing there to indicate that American Honda executives knew about these activities, or a question of that type, and there's tons of things, reams of things

in that file, that's wrong. When the file isn't even complete because you have a memorandum from Mr. Proulx that you haven't turned over to the defense at all and don't get turned over till weeks later, well, isn't that question kind of a little bit false?

poraneous objection, we may notice only "plain error." *United States v. Tuesta–Toro,* 29 F.3d 771, 776–77 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 947, 130 L.Ed.2d 890 (1995); Fed.R.Crim.P. 52(b). Viewed in the context of the entire trial, *United States v. Smith,* 982 F.2d 681, 682 (1st Cir.1993), the prosecutor's remarks, though plainly inappropriate, did not undermine the fundamental fairness of Josleyn's trial. *See United States v. Young,* 470 U.S. 1, 16, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985).

Although at times it may be difficult to distinguish improper vouching from zealous advocacy, there can be no doubt that the statements at issue here constituted improper rebuttal:

> Now there was a lot of suggestion of false play in this case. I want to say this. I'm a married person with a family, and I go home at night with a sound conscience. I have worked very hard on this case. Mr. Feith has worked very hard on this case. Mr. Mulvaney and Miss Roux have worked very hard on this case. And we are very proud of what we have done. We have done nothing to be ashamed of.[11]

Injecting the prosecutor's personal life and individual efforts into the decisional mix not only invited the jury to consider irrelevant matters beyond the record, but unfairly evoked jury sympathy and diverted attention from the relevant evidence. *See United States v. Rosales,* 19 F.3d 763, 767 (1st Cir. 1994) (prosecutor denied fabricating evidence against defendant).

 There should be no need to remind federal prosecutors that they are not free to disregard the bounds of proper argument even in response to perceived provocation. *See Young,* 470 U.S. at 18–19, 105 S.Ct. at 1047–48. The important precept that the prosecutor may not vouch for the credibility of a government witness is deeply rooted in

American law. *See Rosales,* 19 F.3d at 767 ("When the prosecutor places the credibility of counsel at issue, the advantage lies with the government ....") (citations omitted). Thus, a prosecutor may not lend the prestige of the government to buttress a witness, nor indicate to the jury that information known to the prosecutor, but not admitted in evidence, supports the government's theory of the case. *Young,* 470 U.S. at 18–19, 105 S.Ct. at 1047–48.

 The appropriate response for the prosecutor in these circumstances is to lodge a contemporaneous objection and request an appropriate curative instruction. *See id.* at 13, 105 S.Ct. at 1045. Failing that, the prosecutor is constrained to a fair discussion of the evidence. But for the brief passage challenged on appeal, *see supra* at p. 1189, the prosecution adhered to the appropriate standard.

 Under the "plain error" standard, appellants bear the burden of showing that the prosecutor's remarks resulted in prejudice, i.e., affected their substantial rights. *See United States v. Olano,* 507 U.S. 725, 732–34, 113 S.Ct. 1770, 1776–78, 123 L.Ed.2d 508 (1993). Even then, however, we will not notice error unless it caused "a miscarriage of justice" or seriously undermined "the integrity or public reputation of judicial proceedings." *Id.* We must consider the likely impact the prosecutor's remarks had on the jury in light of the entire record, including the closing argument presented by the defense. *Young,* 470 U.S. at 16–17, 105 S.Ct. at 1046–47.

Compared with defense counsel's attack against the integrity of the prosecuting attorneys throughout closing argument, *see supra* note 11, their rebuttal was moderate. *See United States v. Oreto,* 37 F.3d 739, 746 (1st Cir.1994) (tolerating measured response to repeated attempts to magnify government

---

11. Nor have we any doubt that defense counsel provoked the prosecution to these excesses. *See United States v. Grabiec,* 96 F.3d 549, 550–51 (1st Cir.1996). Referring to Cardiges' testimony, Josleyn's counsel argued: "It's wrong to lie, and it's also wrong to help you lie; to ask them questions [when you know] that the answers are going to be untrue.... I call it disgusting." Later, he

added: "You want to see mail fraud? Stick this indictment in the mail and you'll see a mail fraud." Josleyn's counsel made an improper appeal for jury nullification as well: "People aren't born and the Almighty says you may be a prosecutor. That's a right that's given by the people. It's a trust. And when it's abused, somebody's got to do something about it."

misconduct), *cert. denied,* —— U.S. ——, 115 S.Ct. 1161, 130 L.Ed.2d 1116 (1995). In all events, the district court prudently countered the risk of serious residual prejudice by promptly cautioning the jury that counsel's arguments are not evidence, and directing the jury to base its verdicts solely on the evidence. *See United States v. Mejia–Lozano,* 829 F.2d 268, 274 (1st Cir.1987). Given the overwhelming evidence against Josleyn, *see supra* Section II.B.3(b), the provocative excesses in the closing argument presented by his own counsel, and the timely jury instructions by the district court, the improper remarks by the prosecutor in rebuttal did not rise to the level of plain error. *See Rosales,* 19 F.3d at 767–68 (finding similar vouching *harmless* error).[12]

### D. *The Billmyer Sentencing Claim*

 Billmyer challenges a two-level enhancement of his base offense level ("BOL") for abusing a position of private trust. *See* U.S.S.G. § 3B1.3 (1995). We review the § 3B1.3 ruling *de novo. United States v. Tardiff,* 969 F.2d 1283, 1289 (1st Cir.1992). As Billmyer acknowledges a sound factual basis for the § 3B1.3 enhancement, we need only apply the pertinent guideline language.

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. *This adjustment may not be employed if an abuse of trust*

> *or skill is included in the base offense level or specific offense characteristic.* ·

U.S.S.G. § 3B1.3 (Nov. 1995) (emphasis added).

The district court applied U.S.S.G. § 2B4.1 (commercial bribery) to determine Billmyer's BOL. As the specific offense characteristics listed in § 2B4.1(b) are not germane,[13] we must consider whether the BOL prescribed in § 2B4.1 "included" an abuse-of-trust component which would render the offense level enhancement invalid under the second sentence in § 3B1.3.

The Guidelines prohibit the sentencing court from imposing an abuse-of-trust enhancement in a *public* bribery case, *see* U.S.S.G. § 2C1.1, comment. (n. 3), unless special circumstances require reference to other offense guidelines, *see id.* § 2C1.1(c). Thus, in its main thrust the present challenge attempts to equate Billmyer's commercial bribery offense with bribery of a public official. According to Billmyer, the same general rule must apply because public bribery and private bribery are "virtually identical" offenses. We are not persuaded.

The absence of an *explicit* provision restricting the application of the abuse-of-trust enhancement in commercial bribery cases severely undercuts the analogy urged by Billmyer. *See United States v. Newman,* 982 F.2d 665, 673–74 (1st Cir.1992) (applying *expressio unius est exclusio alterius* principle in this sentencing context), *cert. denied,* 510 U.S. 812, 114 S.Ct. 59, 126 L.Ed.2d 28 (1993). Furthermore, the Sentencing Commission

---

**12.** Citing *United States v. DiLoreto,* 888 F.2d 996, 999 (3d Cir.1989), Josleyn suggests that prosecutorial vouching requires reversal *per se. DiLoreto* was not only inconsistent with First Circuit case law, it has been overruled. *See United States v. Zehrbach,* 47 F.3d 1252, 1264–65 (3d Cir.) (en banc), *cert. denied,* —— U.S. ——, 115 S.Ct. 1699, 131 L.Ed.2d 562 (1995). Furthermore, Josleyn's strongest authority, *see United States v. Smith,* 962 F.2d 923, 933–36 (9th Cir. 1992) (finding plain error), is readily distinguishable. There, defense counsel did not allege that the prosecutor either withheld evidence or suborned perjury, *id.* at 934; moreover, the prosecutor had invoked both the prestige of the government *and* the authority of the court in rebuttal, *id.* at 936; *cf. United States v. Perez,* 67 F.3d 1371, 1379 (9th Cir.1995) (distinguishing *Smith* on latter ground).

**13.** Section 2B4.1(b) provides:

Specific Offense Characteristics
(1) If the greater of the value of the bribe or the improper benefit conferred exceeded $2,000, increase the offense level by the corresponding number of levels from the table in § 2F1.1 [offense-conduct guideline for fraud and deceit/forgery].
(2) If the offense—
(A) substantially jeopardizes the safety and soundness of a financial institution; or
(B) affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense,
increase by 4 levels. If the resulting offense level is less than 24, increase to level 24.
U.S.S.G. § 2B4.1(b).

took pains throughout the Guidelines to specify the circumstances in which courts should not impose enhancements for abuse of trust.[14] In sum, the overall structure of the Guidelines simply does not warrant the categorical ban advocated by Billmyer.

Moreover, not only does Billmyer cite no supporting case law, but our research discloses ample authority for imposing an abuse-of-trust enhancement in such a case. For example, in *United States v. Butt*, 955 F.2d 77 (1st Cir.1992), the court provided clear explication of its rationale for upholding an abuse-of-trust enhancement in the case of a police officer convicted on a RICO charge, even though the underlying racketeering activity included extortion under color of right.

> The base offense level prescribed by the guidelines for a particular crime presumably reflects, or "includes," those characteristics considered by Congress to inhere in the crime at issue. In the case of extortion under color of right, abuse of trust would be one such characteristic, since Congress could reasonably have determined that every act of extortion under color of right involves an abuse of public trust. Because the RICO statute, by contrast, can be violated in innumerable ways, there are, arguably, no offense characteristics common to all RICO offenses.

*Id.* at 89. The same holds true here.

Billmyer was convicted of mail fraud conspiracy in violation of 18 U.S.C. § 371. As not every mail fraud conspiracy involves an abuse of trust, we cannot conclude that the BOL for commercial bribery necessarily includes an abuse-of-trust element so as to preclude an enhancement pursuant to § 3B1.3. *See United States v. Kummer*, 89 F.3d 1536, 1546–47 (11th Cir.1996) (rejecting

similar argument under U.S.S.G. § 2E5.1 (bribe affecting employee benefit plan)); *cf. United States v. Connell*, 960 F.2d 191, 199 (1st Cir.1992) (finding that BOL applicable to currency reporting violations did not encompass stockbroker's special skill).[15]

*United States v. Sinclair*, 74 F.3d 753, 762–63 (7th Cir.1996), likewise demonstrates that the commercial bribery guideline does not take into account an abuse of trust.[16] Sinclair, a bank officer, was convicted of accepting a bribe in violation of 18 U.S.C. § 215(a)(2), a crime that would seem almost invariably to entail an abuse of trust. Yet the court noted that the statute did not define a single crime, *see id.* § 215(a)(1) (prohibiting person from *offering* bribe to bank officer), and reasoned that it would be wrong to *require* that the briber, who did not necessarily breach a position of trust, receive the same sentence as the bank-officer recipient. *Sinclair*, 74 F.3d at 763. Similarly, we think Billmyer's greater culpability, relative to other defendants who need not necessarily have abused a position of trust in the course of a mail fraud conspiracy, entitled the district court to impose the § 3B1.3 adjustment in this case. Accordingly, we affirm the enhancement.

## III

### CONCLUSION

Finding no reversible error, the district court judgments are affirmed.

### *AFFIRMED.*

---

14. *See, e.g.,* U.S.S.G. § 2A3.1(b)(3), comment. (n. 4) (sexual abuse); *id.* § 2H1.1(b)(1), comment. (n. 5) (violating civil rights); *id.* § 2P1.1(b)(1), comment. (n. 3) (prison escape); *id.* § 2T1.4(b)(1), comment. (n. 2) (aiding tax fraud); *see also Newman*, 982 F.2d at 673–74; *cf. United States v. Wong*, 3 F.3d 667, 670 (3d Cir.1993) (noting Commission's awareness of potential for "double counting").

15. One reasonable explanation for the two-level difference between the BOL for private bribery, *see* U.S.S.G. § 2B4.1 (level 8), and public bribery, *see* U.S.S.G. § 2C1.1 (level 10), may lie in

the fact that the Sentencing Commission factored the abuse-of-trust element into the BOL for public bribery only.

16. *Sinclair* is the only case involving an abuse-of-trust enhancement under U.S.S.G. § 2B4.1. We note, however, that other courts commonly allow an abuse-of-trust enhancement in embezzlement cases under U.S.S.G. § 2B1.1. *See, e.g., United States v. Broumas*, 69 F.3d 1178, 1182 (D.C.Cir. 1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1447, 134 L.Ed.2d 566 (1996).